# Exhibit 6
# Santos Declaration

**The United States' Motion to Find Limited Waiver of Attorney-Client Privilege and Compel Linklaters LLP to Produce Documents**

*United States v. Santos et al.*, 23-CR-2507-RSH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SECTOR RESOURCES LTD,

       Petitioner,

    v.           Case No. 23 Civ. 09728 (ER)

ETHOS ASSET MANAGEMENT, INC. *and* EAST WEST BANCORP INC. a/k/a EAST WEST BANK,

       Respondents.

---------------------------------------------------------------x

**DECLARATION OF CARLOS SANTOS IN SUPPORT OF
DEFENDANT ETHOS ASSET MANAGEMENT, INC.'S OPPOSITION
TO PRELIMINARY INJUNCTION**

  Pursuant to 28 U.S.C. § 1746, I, Carlos Santos, being duly sworn deposes and says:

  1. I am over eighteen years of age and have personal knowledge of the facts set forth below.

  2. I am an Economist, and a holder of Master in Finance, Accounting for Banking, International Taxation, Post Graduations in same fields, being Invited Professor at Lisbon School of Economics and Management and reward with Ernest & Young Portugal Award (2016) and Banco de Portugal Award (2015).

  3. I am the Founder and Chief Executive Officer of Respondent, Ethos Asset Management, Inc. ("Ethos"), which is incorporated in and maintains its principal place of business in California.

  4. I am in the process of obtaining an E-1 immigration visa, which is reserved for people of extraordinary abilities and skills to allow me to stay more then 180 days in the year in USA to make Ethos' work more efficient with my physical presence and manage closer the more than US

$96,007,617.80 invested by Ethos in USA firms in the last two years. *See* Exhibit M (Contract with supplier to support on the visa process).

5. Ethos, which was founded in 2018 in the United States, but is the evolution of the Group founded in Portugal in 2012, is an investment services corporation, specializing in project finance. Ethos has been in business for over a decade with over 90 clients across more than 72 countries. Ethos has offices in San Diego and Northen Virginia, Brazil, South Africa, the United Kingdom, Portugal, and Turkey. Our primary markets are the United States, Brazil, the United Kingdom, Turkey, and Mexico with Infrastructure, Energy and Construction constituting the largest three industries supported by the Group. You can see attached some of our Portfolio of Investments and Investment Policy. On our website are testimonial videos, press releases, and news relating to some of Ethos' most relevant deals. https://www.ethosasset.com/client-tv and https://www.ethosasset.com/news.

6. Ethos has never been found to be involved in any sort of fraud.

7. Ethos offers financing to private clients in all economic sectors through the use of one of three innovative financing models: (1) classic financing, (2) crisis financing, or (3) philanthropic financing. Under Ethos' classic financing model, Ethos (as lender) provides financing to the project promoter, typically disbursed in tranches. The financing is intended to amortize over time, with the project promoter repaying principal and interest at a fixed rate over a long period.

8. To secure the financing under the "classic" arrangement, the project promoter – here, Sector – must put up cash collateral equal to 20-25% of the funding amount, which is deposited into a pledge account controlled by a collateral agent. The collateral agent is typically the bank that controls the pledge account; it is not party to any of the financing documents and does not act as a mediator of the deal. The collateral agent is instructed to invest the collateral in a mix of

2

securities and cash/equity indices. The project promoter must also obtain a margin application from the collateral agent to extend a margin value (equal to 65% of the collateral) to Ethos, which Ethos may use as it sees fit (the "margin value facility").

9. In essence, the collateral is used secondary as security for the financing between Ethos and the project promoter, and priority to secure the margin value facility between the collateral agent and the project promoter.

10. For the avoidance of doubt, regarding Ethos' liquidity, as of the date of filing, Ethos has $699 million in cash and securities." Exhibit L (Financial Reports January 1 - September, 2023).

## The Relationship with Sector and March 2023 Agreement

11. In November 2022, Ethos received Sector Resources' ("Sector" or "Sector Resources") application for financing from an Ethos associate in Brazil. The application was analyzed by Ethos' Credit and Risk Department, as well as its Legal and Compliance Department. After an extensive due diligence review – which focused on identifying any potential issues relating to credit, KYC, AML, ultimate beneficial owners (UBOs), and source of funds – on December 14, 2022, Sector was formally onboarded by Ethos.

12. Ethos entered into the Agreement with Sector on March 29, 2023, *see* ECF No. 4-2, and a later Amendment with Sector, in June 2023, *see* ECF No. 4-3. The Agreement, which provided financing for Sector's projects in connection with mines in Canada and Colombia, was structured as a "classic" arrangement.

13. Under the Agreement, Ethos agreed to loan $50 million to Sector to operate the mines. In consideration for the loan, Sector agreed to provide a Standby Letter of Credit ("**SBLC**") issued by its bank, JP Morgan Chase ("**JPM**"), in the amount of $10 million.

3

14. On April 6, 2023, JPM delivered the SBLC to Ethos' bank, East West Bank ("**EWB**") via SWIFT.  Pet. Ex. 3 at 63; Ex. 7 at 1-4; WD Dec. at ¶ 27(a).

15. But, under the Agreement, satisfaction of the Collateral does not, in and of itself, trigger Ethos' disbursement obligations.  Under Section 4.1 of the Agreement, Sector must ensure "the issuance of … a SBLC and its provision of SWIFT MT760 in the form agreed by [Ethos]."  *See* ECF No. 4-2 at Section 4.1(vii).  Section 4.1 further states, "[a]fter [Ethos'] receiving Bank receives the SWIFT MT760 from [Sector's] issuing Bank and will carry out a verification procedure. In case of **positive verification and activation**, [Ethos] will make the disbursement of funds, in accordance with the disbursement schedule detailed in Exhibit B."  *Id*. (emphasis added).

16. In fact, the "verification and activation" requirement in the Agreement was never met, and Ethos therefore offered the option to Sector to terminate.  Sector decided to try to be able to reduce the SBLC size to be able to have it active and backing a credit line to Ethos to trigger the collateral be in place and for Ethos disbursement schedule to start.

17. On June 5, 2023, Sector signed the Amendment with Ethos with three forms of collateral to Ethos: (i) a SBLC issued by its bank, JPM, in the amount of $5.05 million, to Ethos; (ii) $3.25 million in cash, deposited into in a bank account identified by Ethos; and (iii) a pledge of gold into a bank account identified by Ethos.  *See* ECF No. 4-3 at Section 3.3.

18. Ethos directed EWB to reduce the face value of the SBLC to $5.05 million, and EWB did so.  Pet. Ex. 7 at 5-6; WD Dec. at ¶ 27(c).  This was a decision made after correspondence between Ethos and EWB, whose Credit Committee had concerns about lines of credit due to the difficult banking climate at the time.  EWB considered "blocking the lines" between it and JPM,

4

but decided instead to agree to a reduction in the SBLC. *See* Exhibit P (C. Santos emails with W. Dell'Orfano dated May 5-6, 2023).

19. On June 6, 2023, at Sector's request, JPM wired $3.25 million to Ethos into Ethos' account. Pet. Ex. 3 at 61-2.

20. Because of the SBLC activation continue not happening in fact, the "verification and activation" requirement in the Agreement was never met, and Ethos was therefore under no obligation to make disbursements to Sector. As a result, Ethos never breached the contract.

21. On August 8, I sent a Funds Transfer Request to one of our USA banks, directing them to wire to Sector $3,333,333, as a measure of goodwill to help Sector and personally William who every day was pressuring me for such support.

22. Based on financial needs we decided to use a Switzerland Bank as the bank to provide this goodwill payment. On October 27, our banker there sent me an email confirming that another wire to Sector would "be processed and the credit process will follow."

### Discovery of this Proceeding

23. Ethos was never served in this action.

24. Ethos learned of Sector's Motion for a Temporary Restraining Order and Preliminary Injunction in Aid of Arbitration through its counsel, who discovered it while reviewing recently-filed litigation bulletins.

25. Indeed, Ethos had no notice of this action, despite Ethos communicating with Sector on Friday, November 3, 2023 – the very day of this filing – informing Sector that Ethos would be willing to terminate the Agreement and return Sector's collateral. At no point during Ethos' November 3, 2023 exchange with Sector did Sector notify Ethos of its plan to seek an Emergency TRO that same day.

5

26. As soon as counsel to Ethos learned of the action, it contacted Sector, and offered to return the collateral pursuant to a settlement agreement, resolving the matter immediately. *See* ECF No. 12-1.

27. On November 6, Ethos filed a letter requesting that the Court deny Sector's Motion without prejudice because the Motion was improperly filed as Sector (i) failed to notify or serve Ethos; (ii) failed to comply with Rule 65 of the Federal Rules of Civil Procedure; and (iii) improperly attempted to circumvent the Parties' agreement to mediate; which was a grave error, misguided, dangerous and shocking, at worst, damaging, vindictive, punitive and a deliberate action by Sector. The impact of the petition and filing for a Temporary Restraining Order has placed in the public domain damaging allegations about Ethos (untrue) which has already caused Ethos to suffer reputational damage and harm from around the world with its stakeholders. The reputational damage this will have on Ethos' ability to continue operating and trading has become the focal point of this lawsuit.

28. Also on November 6, pursuant to the Court's November 3 Order, the parties appeared before the Court regarding Sector's request for a temporary restraining order which the Court denied noting that the "dispute has been going on for a number of months," Exhibit B at 16:16-19, without Sector taking any action to redress these alleged harms, including by utilizing the dispute resolution measures set forth in the Agreement. *See id.* at 11:25-12:2 (Q: "And two, have you begun the arbitration proceedings?"; A: "We have not begun the arbitration proceedings . . . ."). The Court further ordered Ethos to respond to Sector's request for a preliminary injunction by close of business on November 8 and Sector to file a reply by November 9.

6

29. Ethos is now trying to manage a crisis. Sector have grossly miscalculated with their flawed strategy. Ethos is currently paying the price for this and will continue to do so. By Sector filing for a Temporary Restraining Order and assuming that it will be granted by the Court, freezing Ethos' bank account at EWB and SBLC, will be a major blow to the heart of Ethos' USA operations. Sector's misguided belief that freezing Ethos' EWB account will secure claimable assets for Sector, whilst Ethos can continue operating as a business and take part in a 1-2 year Arbitration is a fallacy. The reputational damage this will have on Ethos' ability to continue operating and trading has become the focal point of this lawsuit. Brought about by Sector. Ethos may no longer be in operation for Sector to Arbitrate against. To preserve Sector's business, Sector has decided to destroy Ethos' business. This is unethical, immoral and breaches several common business standards, practices and ethics. We sincerely hope Judge Ramos will see through this unhinged action and strategy taken up by Sector and dismiss this complaint in favour of Ethos. However, other Ethos banks may take a dim view of the lawsuit and outcome and take action themselves as the online and public domain shares this news, causing further damage and destruction to Ethos.

30. The damage has already been done to Ethos and this is irreparable. This should be taken into consideration now and an amount calculated and deducted from any settlement figure. However, the magnitude of the problem is frightening for Sector. Ethos' business activity in the USA runs into the hundreds of millions of dollars. If as a result of the actions of Sector, Ethos is no longer able to operate due the reputational damage and harm it suffers, then Ethos will, without reservation, sue Sector robustly for all damages and losses which will be a sum with 9 digits at least.

31. We are already analysing the impact of Sector's erroneous and aggravating action and will be preparing to file a lawsuit against Sector for damages and losses.

32. We must pursue and respect our signed Agreement, which states that all disputes must follow ICC Mediation and Arbitration. We do not accept that we should pay Sector US$3.25M and cancel the SBLC for damaging and potentially destroying our business. We will not reward them for such destruction to Ethos. We will file a motion to compel Arbitration and dismiss this PI claim to move to ICC Mediation and Arbitration. There we can address the damages suffered by Ethos as well as Sector's concerns. Our rights must and will be defended robustly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2023

_____
Carlos Santos