Exhibit #12
Government Sentencing
Memo Exhibits

## AGREEMENT_EAM-SECTOR-1221-2022

## PROJECT

## "COLOMBIA & CANADA"

This Agreement ("Agreement"), dated **March 29th, 2023**, is between **ETHOS ASSET MANAGEMENT INC.**, a California corporation, having its principal place of business at 4660 La Jolla Village Drive, San Diego, California, 92122, United States of America, herein represented by **Mr. CARLOS MANUEL DA SILVA SANTOS** ("Party A" or "EAM") and **SECTOR RESOURCES LTD**, having its principal place of business at Maple & Calder Attorneys at Law, PO BOX 309, Ugland House, South Church Street, George Town, Cayman Islands, KY1-1104, represented by **Mr. WILLIAM DELL'ORFANO** ("Party B" or SECTOR).

Party A and Party B are herein referred to individually as a "Party" and collectively as the "Parties."

### Background

This Agreement codifies the desire between the Party A and Party B to enter in a mutually beneficial relationship, involving the advancement of resources by Party A for the purpose of enabling Party B to develop the Project, as specified herein.

Accordingly, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereto, intending to be legally bound hereby, agree as follows:

### Article 1 Definitions

Terms defined in the preamble and the recitals of this Agreement have their assigned meanings, and the following terms have the meanings assigned to them:

1.1 **"Closing"** means the consummation of the transactions that this Agreement contemplates. The consummation of said transactions (the "**Closing**") shall take place in the first date after Party B satisfies the conditions precedent, that means the collateral to be issued and validated in line with Section. 3.3 is performed. The closing take place after all conditions precedent to the Closing, especially the one stated in Sections 3.4 and 3.6, have been satisfied or waived in writing by the Parties.

1.2 **"Effective Date"** means the date on which this Agreement is signed. The Effective Date may take place online by way of the exchange of executed/ signed documents, or at such other time, date and place as may be agreed in writing by the Parties.

1.3 **"Full Repayment Date"** means the due date of the last repayment by Party B according to sections 3.5 and 3.8.

*PARTY A*                    *PARTY B*

1/23

OPL-380360

**AGREEMENT_EAM-SECTOR-1221-2022**
*Final2*

1.4 **"Project"** means **"COLOMBIA & CANADA"**. A detailed Project description is available in Exhibit C.

## Article 2 Project

2.1 **Purpose**. Party A agrees to advance funds in accordance with, and subject to, the terms and conditions of this Agreement for the purpose of developing the Project set forth in Exhibit C. Party B agrees to deploy such funds in accordance with, and subject to, the terms and conditions of this Agreement. Nothing contained in this Agreement shall be construed as creating any agency, partnership, franchise, business opportunity, joint venture or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

2.2 **Engage in other activities**. Party B shall exclusively use its efforts to develop the Project, and, under no circumstances, shall Party B engage in business or activities outside of what is described in Exhibit C using the funds provided by Party A or nominee.

2.3 **No Liability**. The debts, obligations and liabilities of Party B, whether arising in contract, tort or otherwise, and in connection with the Project, shall be solely the debts, obligations and liabilities of Party B and neither Party A or its members shall be obligated in its financial capacity for any such debt, obligation or liability solely by reason of being a Party of this Agreement.

2.4 **Intent**. Neither Party shall take any action inconsistent with the purpose of the Project and the expressed intent of the Parties as set forth in this Agreement.

2.5 **Payments of Individual Obligations**. The funds provided shall be used solely for and in the benefit of the Project, and no asset that is produced by the Project shall be transferred or encumbered for or in payment of any individual obligation of any member of Party B. Notwithstanding the forgoing, Party B may use such funds or assets for (i) payment of all operating expenses incurred in the ordinary course of the Project ("Project Expenses") and (ii) the satisfaction of indebtedness of, or guaranteed by, Party B. Forty percent (40%) of the disbursed Funds (US$20,000,000) can be used as a partial payment of Party B's current indebtedness. The benefits of payment of Party B's current indebtedness (i.e., any reduction in debt service requirements) shall be invested by Party B in the Project. Project Expenses include exploration costs, facility build out costs, equipment purchases, and management costs to effectively prosecute the business plan described in Exhibit C and shall also include payment of taxes, fees, equipment leases, financial guarantee fees, and governmental charges arising from or relating to the Project. For avoidance of doubt, Party B shall be permitted to make distributions for payment of taxes arising from Party B including reimbursement for payment of tax on Global Intangible Low-Taxed Income or other tax arising from Party B's status as a Controlled Foreign Corporation under the laws of the United States of America. Sector Capital Group, an affiliate of Party B, will enter into a services contract with Party B to provide management and back office services such as financial accounting that is in compliance with the Project's domain countries and consolidated in US standards, Project oversite, staffing, planning, and security monitoring. Notwithstanding anything to the contrary in this Agreement, Party B may make distributions to its equity holders provided that (i) there is not existing Event of Default by Party B under this Agreement, (ii) giving effect to such distribution, Party B has a debt-to-equity ratio of not less than 1:1 where "debt" is Party B's total indebtedness less the face value of the Financial Instrument then in effect, and (iii) Party B generates positive net operation

*PARTY A*                    *PARTY B*

2/23

profit after tax, and Party B keeps in a reserve account the amount of interest due to be paid to Party A in the year following the year of the distribution.

     2.6    **Status and Expenditure Compliance.** The parties agree that Party B shall provide to Party A periodic updates of the status of the Project, and additionally supporting documents and records can be reasonably requested by Party A.

     (i)    The parties agree that Party B shall provide updated quarterly balance sheet and profit and loss statement, quarterly copies of bank statements showing the movements of the disbursed funds and any other relevant status reports of the Project to Party A including summary of work performed and costs incurred substantially in the form reflected in Exhibit C. Such report will be provided approximately 30 Business Days after the end of each quarter. Should any doubts arise from the regular Party B internal reporting system, Party A will have the right to request additional information and documentation.

     (ii)    If Party A determines that there are material inaccuracies or omissions in Party B's reports submitted to Party A pursuant to Section 2.6(i), then Party A will have the right, at Party B's expense and not more frequently than once per calendar trimester, to engage a third party of recognized standing and reasonably acceptable to Party B to examine the Project's books and records, solely to verify the accuracy of Party B's reports submitted to Party A pursuant to Section 2.6(i) and to determine whether or not proceeds from the Financing were spent in accordance with the Project Plan and whether or not the Project was executed in accordance with the Implementation Plan. Party A shall notify Party B 10 banking days in advance and shall not interfere with the business operations of Party B. For avoidance of doubt, it is the intent of the parties that any third party examination be limited in scope to the entity or entities with respect to which such inaccuracies or omissions relate such that, for example, an issue relating to Canadian infrastructure will not necessitate retention of a third party to examine the books and records of the Columbian subsidiary, provided that an issue generally applicable to the Project may require retention of third parties proficient in the laws, rules, and regulations of each applicable jurisdiction.

### Article 3  Funds, Collateral and Payment

     3.1    **Funds.** Subject to the terms and conditions of this Agreement, Party A shall provide funds for the Project in the principal amount of US$50,000,000.00 (the "**Funds**").

     3.2    **Securities regulation exempt.** Party A warrants that the transaction involved in this Agreement is not a securities transaction as defined by the Securities Act of 1933 or the Security Exchange Act of 1934 of the United States of America, or any other laws of any other nation related to securities transactions, and this Agreement and the transactions contemplated herein are exempted from the securities laws and would not be required to be registered with any authority or with any government body.

     3.3    **Collateral.** In consideration for the funds provided by Party A, or nominee, Party B shall issue a Standby Letter of Credit (the "**SBLC**" or the "**Financial Instrument**") to Party A,

*PARTY A*                                *PARTY B*

OPL-380362

substantially in the form attached hereto in **Exhibit A** ("SWIFT MT 760"). The Financial Instrument shall be issued with a nominal value of **US$10,000,000.00**, which shall cover **20%** of the financing of the Project, and it shall be initially issued for a period of one year and one day (the "**Expiration Date**") and re-issued or extended every year up to the maturity of the financing, serving as security for the repayment of the Funds described in Section 3.1 and under the conditions described in **Exhibit B** (the "**Pre-Approval Conditions of Funds Disbursement**").

    3.4   **Collateral requirements**. Party B shall provide the Financial Instrument with the following conditions:

        (i)    **Face value**. The face value of the Financial Instrument (SBLC) shall cover **20%** of the financing of the Project as set forth in Section 3.1.

        (ii)    **Validity**. The Financial Instrument, re-issued or extended every year, shall maintain its validity through **12-years** and until the full Repayment Date as set for the in Section 3.5. The Financial Instrument shall state the date of issuance and the date in which it can be callable by Party B issuing bank;

        (iii)    **Format**. The issuing bank, the verbiage, and the format of the Financial Instrument shall be agreed by the Parties. The draft of the Financial Instrument is attached hereto as, Exhibit A and is part of this Agreement.

        (iv)    **Renewal Extension**. 30 days before its Expiration Date, the Financial Instrument shall be renewed by Party B's Bank sending the SWIFT MT-760 (SBLC) to Party A's Bank for another period of one year and one day.

        (v)    **Renewal Extension Face Value**. Before completing 30 days as of its Expiration Date (one (1) year and one (1) day), the Financial Instrument shall be updated so as to cover only **20%** of the outstanding amount of the Funds payable by Party B and renewed by Party B by causing  Party B's Bank to send the SWIFT MT 760 (SBLC) to Party A' Beneficiary Bank for another period of 1 (one) year and 1 (one) day.

    3.5   **Repayment**. Party B shall repay Party A (the "**Repayment**") the full amount of funds provided by Party A to Party B, paying off the financing mentioned in this Agreement on time (pursuant to the payment schedule set forth in Exhibit B) and in full, and in compliance with all the obligations accepted by Party B, and in accordance with the General Repayment Data set forth in Exhibit B and described in Section 3.7.

    3.6   **Cancellation Upon Repayment**. With the exception of the cancellation criteria described in Section 7, the Financial Instrument shall be cancelled upon full Repayment in accordance with Section 3.5 (i). Promptly after the full Repayment of the funds by Party B, but in no later than ten (10) business day after such Repayment, Party A shall authorize Party B to cancel the Financial Instrument (SBLC).

    3.7   **Condition for Funds.** Party A will provide funds for the Project, if Party B issues the agreed Financial Instrument as a collateral, and if the collateral is issued, delivered and verified, in accordance with the instructions provided by Party A and under the terms stated in Section 3.4 and Article 4.

*PARTY A*                    *PARTY B*

4/23

OPL-380363

3.8 **Funds Disbursement Schedule.** In accordance with the terms and provisions set forth herein, Party A will provide funds for the Project as stated in Section 3.1 in the form of disbursements to Party B with a maturity period of **12-years** (the "**Disbursement Schedule**"). The Disbursement Schedule includes the conditions of pre-approval for the disbursement of funds, approved and signed by the Parties as established in Exhibit B of this Agreement.

3.9 **Repayment period.** In accordance with the terms of this Agreement, Party B shall repay the full amount of funds plus interest payment in a period of **12-years** from the Disbursement Date. **Disbursement Date** means the date of the first disbursement of the principal amount of the Funds or any portion of it and shall be interpreted as of the date in which Party B receives the respective amount in its bank account or at a designated bank.

3.10 **Prepayment.** Funds received and accrued interest may be prepaid only with Party A concurrence, excluding the grace period, as set forth in Exhibit B.

3.11 **Indemnification by Party A.** Party A agrees to indemnify and hold harmless Party B against any losses, claims, damages or liabilities, joint or several, to which Party B may become subject, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) are caused by (i) any untrue statement or alleged untrue statement of a material fact made by Party A, (ii) any breach by Party A of any of its representations, warranties or covenants contained herein, or (iii) the omission or alleged omission by Party A to state a material fact required to be stated herein or necessary to make the statements herein, in light of the circumstances under which they were made, not misleading; and will repay Party B for any legal or other expenses reasonably incurred by Party B in connection with investigating or defending any such loss, claim, damage, liability or action, whether arising out of an action between Party B and a third party provided that such loss, claim, damage or liability is found ultimately to arise out of or be based upon any of the facts set forth in items (i) through (iii) in this Section 3.10.

3.12 **Indemnification by Party B.** Party B agrees to indemnify and hold harmless Party A against any losses, claims, damages or liabilities, joint or several, to which Party A may become subject, or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon (i) any untrue statement or alleged untrue statement of a material fact, (ii) any breach by Party B of any of its representations, warranties or covenants contained herein, or (iii) the omission or alleged omission by Party B to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and will repay Party A for any legal or other expenses reasonably incurred by Party A in connection with investigating or defending any such loss, claim, damage, liability or action, whether arising out of an action between Party A and a third party provided that such loss, claim, damage or liability is found ultimately to arise out of or be based upon any of the facts set forth in items (i) through (iii) in this Section 3.11.

3.13 **Taxes, Duties and Fees.** Each Party, individually and separately, will be responsible for any tax or fee that may arise from this Agreement in connection with the development of the Project.

       (i)   **Operational Fee.** Party B shall pay to Party A an Operational fee equal to 3% of the Funds advanced with such fee to be paid based upon the amount of each disbursement per the Disbursement Schedule. Party B authorizes

*PARTY A*                *PARTY B*

5/23

OPL-380364

Party A to deduct such Operational Fee from each disbursement tranche of the Funds made per the Disbursement Schedule

(ii) **Intermediary Fee**, Party B shall be responsible for paying an "**Intermediary Fee**" in connection with the transactions contemplated by this Agreement based upon onboarding process, developing, submitting and managing documentation, assisting in closing the financing, conducting follow-up and support during all phases of the operation, Party B and any other person or entity (an "**Intermediary**"). The Intermediary Fee equal to 2% of the Funds with such Intermediary Fee to be paid based upon the amount of each disbursement per the Disbursement Schedule. Party B authorizes Party A to pay directly to the Intermediary identified on Exhibit D the "Intermediary Fee" due to such Intermediary with respect to each disbursement tranche of the Funds made per the Disbursement Schedule.

3.14 **Confidential Information**. All information contained herein constitutes confidential information between the Parties and shall be kept confidential and shall not be disclosed by the Parties. In addition, Parties and its owners, officers, managers, and employees shall not disclose or otherwise make available "Confidential Information" of the other Parties to any third party. Notwithstanding the forgoing, Party B may disclose this Agreement and its terms to its affiliates and may disclose this Agreement, but not the Exhibits, to any of the potential bank issuer of the SBLC required hereunder once in substantially final form and Party A is notified in advance. "**Confidential Information**" means any and all information about a Party's business affairs, business plans, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information. Confidential Information shall not include information that, at the time of disclosure is: (a) in the public domain; (b) required to be disclosed by governmental order or legal process (subject to the notice requirements in Section 9.3); or (c) rightfully obtained by receiving Party on a non-confidential basis from a third party.

## Article 4  Financial Instrument Procedure

4.1 The issuance and delivery of the Financial Instrument shall be performed under Party A instructions and under the following conditions:

(i) Parties sign this Agreement;

(ii) Party B, within a reasonable time, ensures the issuance of an updated bank statements ("Proof of Funds") confirming financial capacity of Party B and the willingness of Party B's issuing bank to issue a SBLC and its provision of SWIFT MT760 in the form agreed by Party A.

(iii) Party B shall send by email to Party A, the Proof of Funds and an Authorization to Verify Funds (ATV) in favor of Party A.

(iv) Party A shall promptly verify the Proof of Funds.

(v) Party B shall instruct its issuing bank, within a 3-day period upon the conclusion of the verification by Party A.

*PARTY A*                          *PARTY B*

OPL-380365

AGREEMENT_EAM-SECTOR-1221-2022
*Final2*

(vi)    The SWIFT MT760 shall be issued in the format and wording agreed by the receiving Bank. The issuing bank of Party B will send, through banking e-mail, a certified copy of the SWIFT MT 760 to Party A.

(vii)   After Party A's receiving Bank receives the SWIFT MT760 from the Party B's issuing Bank and will carry out a verification procedure. In case of positive verification and activation, Party A will make the disbursement of funds, in accordance with the disbursement schedule detailed in Exhibit B.

4.2    **Bank Coordinates.** The issuance and delivery of the Financial Instrument shall be performed under Party A instructions and under the following bank coordinates:

### 4.2.1 Party B's Issuing Bank Information

SENDER BANK: JP Morgan Chase Bank N.A.

ADDRESS: 383 Madison Avenue, New York, NY 10017

ACCOUNT NAME: Sector Resources, Ltd.

ACCOUNT HOLDER ADDRESS: ▮▮▮▮▮▮▮▮    Manchester, NH 03101

ACCOUNT NUMBER: ▮▮▮▮▮▮▮

ROUTING NUMBER: ▮▮▮▮▮▮

SWIFT CODE: ▮▮▮▮▮

BANK OFFICER: Katherine Post

OFFICER PHONE: ▮▮▮▮▮▮

### 4.2.2 Party A's Beneficiary Bank Information

Beneficiary Bank: EAST WEST BANK (EWB)

Bank Address: 9300 Flair Drive, 4th Fl., El Monte, CA 91731

Account Name: ETHOS ASSET MANAGEMENT INC

ACCOUNT HOLDER ADDRESS: 4660 La Jolla Village DR, San Diego, CA 92122

ACCOUNT NUMBER: ▮▮▮▮▮▮

ROUTING NUMBER: ▮▮▮▮▮▮

SWIFT CODE: ▮▮▮▮▮▮ .

### 4.2.3 Party B's Funds Disbursement Receiving Bank Information

BANK: JP Morgan Chase Bank N.A.

ADDRESS: 383 Madison Avenue, New York, NY 10017

ACCOUNT NAME: Sector Resources, Ltd.

*PARTY A*                    *PARTY B*

7/23

OPL-380366

ACCOUNT HOLDER ADDRESS: ▮▮▮▮▮, Manchester, NH 03101

ACCOUNT NUMBER: ▮▮▮▮▮

ROUTING NUMBER: ▮▮▮▮▮

SWIFT CODE: ▮▮▮▮▮

BANK OFFICER: Katherine Post

OFFICER PHONE: ▮▮▮▮▮

### Article 5  Representations and Warranties

5.1   Party A represents and warrants that as of the Effective Date:

- (i)   Party A is a duly formed corporation in good standing under the laws of CALIFORNIA, USA, with full power and authority to perform its obligations herein.

- (ii)   This Agreement has been duly authorized, executed and delivered by Party A and, upon due authorization, execution, and delivery by Party B, will constitute the valid and legally binding Agreement of Party A enforceable in accordance with its terms.

- (iii)   Neither Party A nor any of its subsidiaries has, nor any director, officer, agent, employee or other person acting on behalf of Party A or any subsidiary has in the course of his actions for or on behalf of Party A, used any corporate funds for any unlawful contribution, gift, entertainment, or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee. Without limiting the generality of the foregoing, Party A and its subsidiaries have not directly or indirectly made or agreed to make (whether or not said payment is lawful) any payment to obtain, or with respect to, sales other than usual and regular compensation to its or their employees and sales representatives with respect to such sales.

- (iv)   Party A  it has not violated or is in violation of any applicable laws relating to terrorism or money laundering, including, without limitation, the USA Patriot Act, or has not been engaged in or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in any applicable law, regulation or other binding measure implementing the 40 Recommendations and the IX Special Recommendations published by the

*PARTY A*                    *PARTY B*

8/23

OPL-380367

Organization for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.

(v)    Party A is in compliance in all material respects with, and shall so comply with, all applicable laws, regulations, and ordinances relating to its business and all material contracts and agreements to which it is a party.

(vi)    Party A voluntarily signed this Agreement, free from any influence, enforcement or misrepresentation of any kind.

5.2    The Party B represents and warranties that as of the Effective Date:

(i)    Party B is a duly formed and validly existing LIMITED COMPANY under the laws of CAYMAN ISLANDS, with full power and authority to perform its obligations herein.

(ii)    This Agreement has been duly authorized, executed and delivered by Party B and, upon due authorization, execution and delivery by Party A, will constitute the valid and legally binding Agreement of Party B enforceable in accordance with its terms.

(iii)    All information contained in the documents submitted to Party A by Party B are true in all material respects.

(iv)    that the delivered SBLC of the issuing Bank, sent to the receiving Bank by SWIFT MT760, under this Agreement: is a legitimate, clear, transparent Financial Instrument; it has no criminal origin; it is free of any pledge, lien or encumbrance; it is managed and issued in compliance with the legal requirements of the International Chamber of Commerce, hereinafter known as "ICC", Paris, France; and is available without any restrictions.

(v)    Neither Party B nor any of its subsidiaries has, nor any director, officer, agent, employee or other person acting on behalf of Party B or any subsidiary has in the course of his actions for or on behalf of Party B, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee. Without limiting the generality of the foregoing, Party B and its subsidiaries have not directly or indirectly made or agreed to make (whether or not said payment is lawful) any payment to obtain, or with respect to, sales other than usual and regular compensation to its or their employees and sales representatives with respect to such sales.

(vi)    Party B, it has not violated or is in violation of any applicable laws relating to terrorism or money laundering, including, without limitation, the USA

*PARTY A*               *PARTY B*

OPL-380368

Patriot Act, or has not been engaged in or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in any applicable law, regulation or other binding measure implementing the 40 Recommendations and the IX Special Recommendations published by the Organization for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.

(vii) Party B is in compliance in all material respects with, and shall so comply with, all applicable laws, regulations, and ordinances relating to its business and all material contracts and agreements to which it is a party.

(viii) Party B voluntarily signed this Agreement, free from any influence, enforcement or misrepresentation of any kind.

### Article 6  Covenants and Warranties

6.1    Party A is obligated to consummate the transaction contemplated by this Agreement only if each of the following conditions has been satisfied or waived on or before the Closing Date:

(i)    **Representations and Warranties**. The representations and warranties of Party B set forth herein must be true as of the Closing Date.

(ii)    **Covenants**. Party B shall have performed all its obligations and agreements and complied with all its covenants contained in this Agreement to be performed and complied with Party B prior to the Closing Date.

6.2    Party B is obligated to consummate the transaction contemplated by this Agreement only if each of the following conditions has been satisfied or waived on or before the Closing Date

(i)    **Representations and Warranties**. The representations and warranties of the Party A set forth herein must be true as of the Closing Date.

(ii)    **Covenants**. Party A shall have performed all its obligations and agreements and complied with all its covenants contained in this Agreement to be performed and complied with Party A prior to the Closing Date.

### Article 7  Events of Default

7.1    Event of Default by Party B. An Event of Default by Party B will occur if any of the following occurs:

(i)    Party B fails to pay Party A any amount due pursuant to this Agreement on the due date and after Party A sends written notice (a "Notice") fails to remedy such failure within 10 (ten) business days.

(ii)    Party B breaches any obligations, conditions, representations and warranties, stated in this Agreement or any other agreement it has entered into with Party A, if such

*PARTY A*                              *PARTY B*

10/23

OPL-380369

obligation, condition, representation, or warranty is capable of being remedied, and Party B fails to remedy it within 30 (thirty) business days after written Notice from Party A.

    (iii)    Party B abandons or suspends the development of the Project for a period of more than 6 (six) months and after Party A sends written Notice Party B fails to remedy it within 30 (thirty) business days.

7.2    Upon an Event of Default, under Section 7.1, the unpaid portion of the principal amount will bear simple interest from the date of the Event of Default to the payment date at a rate equal to two percent (2.00%) per annum, for the duration of such Event of Default.

7.3    Execution of the Collateral by Party A. Following an Event of Default by Party B under Section 7.1, Party A will be entitled to execute the Financing Instrument to mitigate the damages caused by the default. Under no circumstances, other than default by Party B may Party A execute the Financing Instrument.

    7.3.1  In the event that the default by Party B is under the Section 7.1. i) the execution of the Financing Instrument should go up to the default amount, that corresponds to the amount due for lack of repayment. Party A may terminate the Agreement, being the sole and exclusive option.

    7.3.2  In the event that the default by Party B is under the Section 7.1. ii) or iii) the execution of the Financing Instrument should go up to the outstanding financing amount up to the unexecuted face value amount of the Financial Instrument.

7.4    Event of Default by Party A. An Event of Default by Party A will occur if any of the following occurs:

    (i)    Party A fails to pay Party B any amount due pursuant to this Agreement on the due date and after Party B sends written Notice fails to remedy such failure within 10 (ten) business days. .

    (ii)    Party A breaches any obligations, conditions, representations, and warranties, stated in this Agreement or any other agreement it has entered into with Party B, if such obligation, condition, representation, or warranty is capable of being remedied, and Party A fails to remedy it within 10 (ten) business days after written Notice from Party B.

7.5    Upon an Event of Default by Party A, under Section 7.4, the unpaid portion of the principal amount will bear simple interest from the date of the Event of Default to the payment date at a rate equal to two percent (2.00%) per annum, for the duration of such Event of Default.

7.6    Cancelation of the Collateral in the Event of Default by Party A, under Section 7.4, Party B shall notify Party A and cancel the Financing Instrument and the Agreement shall be automatically terminated.

## Article 8  Termination

*PARTY A*            *PARTY B*

11/23

OPL-380370

8.1     **Term**. The term of this Agreement (the "**Term**") and the rights and obligations set forth herein shall commence on the Effective Date and terminate on the Full Repayment Date, unless terminated earlier in accordance with Sections 8.2 and 8.3.

8.2     **Termination for default by Party A**. This Agreement shall terminate if any of the events of default mentioned in Section 7.4 occurs. In this case, Party B shall retain all the funds disbursed by Party A and Party A must release the Collateral. This Agreement is automatically terminated if Party A defaults for non-disbursement in line with Section 7.4(i). The terms set forth in Section 9.3 and Section 9.4 shall apply in case of termination for default by any of the Parties.

8.3     **Termination for default by Party B**. Party A may terminate this Agreement if any of the events of default mentioned in Section 7.1 occurs. In this case, Party B shall repay all the funds disbursed by Party A within 30 business days and Party A shall execute the Financial Instrument. The terms set forth in Section 9.3 and Section 9.4 shall apply in case of termination for default by any of the Parties.

8.4     **Termination**. If Party B issues a Financial Instrument which does not fulfill the conditions stated in Section 3.4, Party A may terminate this Agreement at any time upon prior written notice to Party B, provided that if such default is curable, Party B shall have 10 days to cure following such notice. In this case, Party A shall be entitled to a refund of the full amount of funds transferred or disbursed to Party B.

8.5     **Effect of Termination**. Upon termination or expiration of this Agreement, each Party shall promptly return to the other Party all relevant records and materials in its possession or control containing or comprising the other Party's Confidential Information and to which the Party does not retain rights hereunder; provided, however, that each Party shall be entitled to retain copies of the other Party's Confidential Information to the extent necessary to comply with applicable regulatory obligations and shall be entitled to retain one copy of the other Party's Confidential Information for archival purposes.

8.6     **Survival**. In the event of the expiration or early termination of this Agreement, the provisions of Sections 3.10, 3.11, and 8.4 (to the extent related to an action or claim originating before such expiration or termination), and Article 5 and Article 9 and such other provisions that by their terms should reasonably be judged to survive expiration or termination, shall survive for the period specified therein or, in the absence of such specification, indefinitely.

### Article 9  Miscellaneous

9.1     **Amendments and Waivers.** This Agreement shall not be amended, modified, or waived in any manner except by an agreement in writing duly executed and delivered by each of the Parties. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

*PARTY A*                                    *PARTY B*

12/23

OPL-380371

9.2 **Force Majeure.** This Agreement shall be subject to the ICC Force Majeure Clause 2003. Neither Party hereto shall bear any responsibility for the full or partial non-fulfilment of its contractual obligations if this non-fulfilment is due to Force Majeure circumstances, as stated by the ICC latest edition, arisen after the signature of the present Agreement. The fulfilment term of the contractual obligations of either Party hereto shall accordingly be postponed for the period during which such circumstances remain. Either Party hereto shall be obliged to immediately inform the other Party about the beginning, probable duration, and cessation of the Force Majeure circumstances. The non-notification about the Force Majeure circumstances shall cancel the right of either Party hereto to make reference to them under the present Agreement.

9.3 **Confidentiality.** Each Party agrees that it shall keep the terms, amount, circumstances, data, documentation, company information and facts of this Agreement, and information of the Parties related or not related with this Agreement, completely confidential, and that it will not hereafter disclose any information concerning this Agreement or about both Parties to anyone except as expressly provided in Section 3.13. Each Party shall not make any comments, recommendations or express any opinions to any third party neither voluntarily nor if approached whether related or not related to this Agreement provided, however, that such Parties may make such disclosure to their professional representatives (e.g., attorneys), if any, all of whom will be informed of and agree to be bound by this confidentiality clause, or other such disclosures required by law. If any Party receives an inquiry about this Agreement, such Party shall communicate such approach to the other Party and shall agree with the other Party an answer to provide. In such answer the Party can not mention or refer to the other Party in any negative or derogatory way. Further, the Parties shall not post or otherwise disclose or reveal, or cause to be disclosed or revealed, to any person or entity any of the Confidential Information on the Internet or any other media outlet or platform, including but not limited to websites, newspapers, email, text, Facebook, Instagram, LinkedIn, and Twitter. Disclosing of information and facts of this Agreement, and information of the Parties related or not related to this Agreement may be used in media like Press Releases, Interviews, or any other type with the exclusive consent of the Parties. If a Party receives an order from a court, a subpoena, or other lawful command to produce this Agreement, the Party receiving such order, subpoena or command shall notify the other Party prior to producing this Agreement to anyone. In response to that notification, a Party may (but does not have to) pursue whatever legal action they deem necessary to preserve the confidentiality of this Agreement. It is understood and agreed that this Agreement may be offered into evidence to enforce its terms. This Section 9.3 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

9.4 **Non-Disparagement.** The Parties shall not disparage any of the other Parties, or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents, members, advisors, or attorneys, or otherwise take any action that could reasonably be expected to affect adversely the professional or personal reputation of the Parties or any of their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents , members, advisors or attorneys. Each Party agrees and covenants that they will not, and will use reasonable efforts to cause its officers and directors not to, at any time, directly or indirectly, make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning any other Party or its businesses, or any of its their affiliates, parents, subsidiaries, and their respective shareholders, directors, officers, employees, agents, members, advisors or attorneys. This Section 9.4 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

*PARTY A*                          *PARTY B*

13/23

OPL-380372

9.5 **Merger**. Any corporation or entity into which the Parties may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Parties will be a party, or any corporation or entity succeeding to the business of the Parties will be the successor of the Parties hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

9.6 **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Acts except in respect to any non-US entity, whereby originals can be required by the Party A.

9.7 **Assignment and Delegation**. No Party may assign any right or delegate any duty under this Agreement without the prior written consent of the other Party which shall not be unreasonably withheld, conditioned, or delayed. All assignments of rights are prohibited, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner, provided that this section shall not restrict the sale of either Party's capital stock or like equity interest. The sale of either Party's capital stock or like equity interest shall be notified to the other Party at least 30 (thirty) banking days in advance. A purported assignment or purported delegation in violation of this Section 9.7 is void.

9.8 **Notices**. Any notice permitted or required hereunder shall be in writing in English and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction and shall be effective upon actual receipt by the Parties in accordance with the terms hereof. Each of the appointed directors and individuals have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party. Any notice or instruction must be originated from a corporate domain. The Parties agree that the above security procedures are commercially reasonable.

### If to ETHOS ASSET MANAGEMENT INC.

Mr. CARLOS MANUEL DA SILVA SANTOS

*PARTY A*                    *PARTY B*

14/23

OPL-380373

AGREEMENT_EAM-SECTOR-1221-2022
*Final2*

CEO
4660 La Jolla Village Drive, San Diego, California, 92122, United States of America
carlos@ethosasset.com

**If to SECTOR RESOURCES LTD.**

Mr. WILLIAM DELL'ORFANO
President & Chairman
Maple & Calder Attorneys at Law,
George Town, Cayman Islands, KY1-

9.9 **Exhibits**. Attached hereto and incorporated herein by this reference are the following exhibits: Exhibit A, Exhibit B and Exhibit C.

9.10 **Severability**. If any provision of this Agreement is illegal or unenforceable, that provision is severed from this Agreement and the other provisions remain in force.

9.11 **Non-Circumvention and Non-Disclosure**. This Agreement incorporates the rules of Non-Circumvention and Non-Disclosure established by the ICC, which rules are made a part hereof by this reference. This Section 9.12 shall survive the termination of this Agreement and remain in force and effect as of the Effective Date.

9.12 **English Language**. All documentation and information related to this Agreement shall be conducted in English.

9.13 **Arbitration**. In the event of any dispute arising out of or in connection with the present Agreement, the Parties shall first refer the dispute to proceedings under the ICC Mediation Rules. The place of mediation shall be New York City, New York. If the dispute has not been settled pursuant to the said Rules within 60 days following the filing of a Request for Mediation or within such other period as the Parties may agree in writing, such dispute shall thereafter be finally settled under the Rules of Arbitration of the ICC by three arbitrators appointed in accordance with the said Rules of Arbitration. The place of Arbitration shall be New York City, New York. The language of the arbitration shall be English. The arbitration shall be the sole and exclusive forum for resolution of any dispute, and the award shall be in writing, state the reasons for the award and be final and binding. Judgment thereon may be entered in any court of competent jurisdiction. The Parties shall keep any mediation and/or arbitration confidential and shall not disclose to any person other than those necessary to the conduct of those proceedings (i) the existence of the mediation and/or arbitration, (ii) any document, testimony, transcripts or other information submitted, exchanged or created for the arbitration, or (iii) any decisions, orders, or awards, unless such disclosure is (A) required by law or a governmental or regulatory body, (B) necessary for a Party to seek legal, accounting or other professional services, or (C) for the purpose of making an application to any competent court relating to any aspect of a mediation and /or arbitration, including motions to recognize, enforce or challenge an award or interim measure, provided that, in all of the circumstances (A) to (C) above, the producing Party takes reasonable measures to ensure that the recipient preserves the confidentiality of the information provided. The prevailing Party, as determined by the arbitrators, shall be entitled to recover its reasonable costs and attorneys' fees from the non-prevailing Party. .

*PARTY A*                    *PARTY B*

15/23

OPL-380374

9.14 **Governing Law.** The dispute resolution provision set forth in Section 9.13 of this Agreement is subject to the Uniform Rules of ICC. In all matters this Agreement is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

9.15 **Waiver of Right to Jury Trial.** Each party hereby irrevocably waives all right to trial by jury in any proceeding or counterclaim (whether based on contract, tort, statute or otherwise) arising out of or relating to this agreement, the transactions contemplated hereby or the actions of such party in the negotiation, administration, performance, and enforcement hereof. Each party further waives any right to seek to consolidate any proceeding in which a jury trial has been waived with any other proceeding in which a jury trial cannot or has not been waived. Each Party certifies and acknowledges that (i) no representative, agent or attorney of any other party has represented or warranted, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) each party understands and has considered the implications of this waiver, (iii) each party makes this waiver voluntarily and (iv) each party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this section 9.16.

[REMAINING PART OF THIS SECTION INTENTIONALLY LEFT BLANK]

*PARTY A*                              *PARTY B*

16/23

OPL-380375

To evidence the Parties' agreement to this Agreement, each party has executed and delivered it on the date stated in the preamble.

The electronic version of a copy signed by both Parties shall be deemed legally binding and enforceable and is valid until full execution.


**ETHOS ASSET MANAGEMENT INC.**


By: _____
Mr. CARLOS MANUEL DA SILVA SANTOS
CEO



**SECTOR RESOURCES LTD.**

By: _____
Mr. WILLIAM DELL'ORFANO
President & Chairman

*PARTY A*                     *PARTY B*

OPL-380376

## EXHIBIT A

### SWIFT MT 760

XX December 2022

XXXX XX:XX:XX

----------------- Instance Type and Transmission --------------------

Original received from SWIFT

Priority/Delivery:

Message Output Reference:

Correspondent Input Reference:

---------------------- Message Header --------------------------------

Swift OUTPUT FIN 760 Guarantee

Sender: XXXXXXXXXXX

Receiver EAST WEST BANK

  U.S.A.

REFERENCE: AGREEMENT NO EAM-SECTOR-1221-2022BETWEEN ETHOS ASSET MANAGEMENT AND SECTOR RESOURCES LTD, SIGNED ON xzth JANUARY XXTH, 2023

FROM: FULL NAME AND ADDRESS OF SBLC ISSUING BANK

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER _____ FOR ACCOUNT OF ETHOS ASSET MANAGEMENT INC., IN FAVOR OF EAST WEST BANK, 135 N. LOS ROBLES AVE, 2ND FLOOR, PASADENA, CA 91101, USA FOR UP TO AN AGGREGATE AMOUNT OF USD XXXXXXXX (XXXXXX MILLION U.S. DOLLARS) AS SECURITY FOR CREDIT/BANKING FACILITIES WHICH YOU WILL GRANT TO ETHOS ASSET MANAGEMENT INC. LOCATED IN UNITED STATES OF AMERICA HEREINAFTER CALLED 'BORROWER'.

THIS STANDBY LETTER OF CREDIT IS PAYABLE AGAINST PRESENTATION OF YOUR DEMAND TO US AT [INSERT ISSUING BANK'S ADDRESS OF PLACE FOR PRESENTATION] STATING EITHER OF THE FOLLOWING:

'WE HEREBY DEMAND PAYMENT OF UP TO USD XXXXXXXX (XXXXXX MILLION U.S. DOLLARS) UNDER YOUR IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER _____. THE AMOUNT CLAIMED BY US REPRESENTS AND COVERS UNPAID INDEBTEDNESS INCLUDING PRINCIPAL, INTEREST, CHARGES, AND EXPENSES INCURRED, DUE TO EAST WEST BANK, ARISING FROM THE GRANTING OF BANKING FACILITIES TO ETHOS ASSET MANAGEMENT INC. LOCATED IN UNITED STATES OF AMERICA. THIS CLAIM DOES NOT, HOWEVER, CONSTITUTE A RELEASE OF ANY REMAINING AMOUNTS OWED BY BORROWER TO EAST WEST BANK.'

*PARTY A*       *PARTY B*

OPL-380377

AGREEMENT EAM-SECTOR-1221-2022

*Final2*

DEMANDS PRESENTED BY AUTHENTICATED SWIFT MESSAGE TO OUR SWIFT ADDRESS ████████████ ARE ACCEPTABLE.

THIS STANDBY LETTER OF CREDIT EXPIRES ON _____ (INSERT EXPIRY DATE WHICH SHOULD BE ONE YEAR AND ONE DAY AFTER THE ISSUANCE DATE) AT THE COUNTERS OF THE ISSUING BANK.

PARTIAL AND MULTIPLE DRAWINGS UNDER THIS STANDBY LETTER OF CREDIT ARE ALLOWED.

ALL BANKING CHARGES IN CONNECTION WITH THIS STANDBY LETTER OF CREDIT ARE FOR ACCOUNT OF THE APPLICANT.

WE HEREBY IRREVOCABLY ENGAGE WITH YOU THAT PAYMENT(S) WILL BE DULY EFFECTED ACCORDING TO YOUR INSTRUCTIONS WITHIN THREE (3) BANKING DAYS FROM DATE OF RECEIPT OF SUCH PRESENTATION(S) OR DEMAND(S) VIA SWIFT.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS IRREVOCABLE STANDBY LETTER OF CREDIT IS ISSUED SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998 (ISP98) (INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590).

*PARTY A*                    *PARTY B*

19/23

OPL-380378

## EXHIBIT B

## PRE-APPROVAL CONDITIONS OF FUNDS DISBURSEMENT AND REPAYMENT

Basic information about the Parties to the Agreement:

| | |
|---|---|
| **Financial Partner** "PARTY A" | **ETHOS ASSET MANAGEMENT INC.** |
| **Project Manager** "PARTY B" | **SECTOR RESOURCES LTD.** |
| **Guarantor** "PARTY B" | **SECTOR RESOURCES LTD.** |
| **Collateral** | **SBLC - USD 10,000,000.00** |
| **Underwriting Bank** | TBC |

**All the amounts described in this table ARE GROSS VALUES.**
**The actual amount to be transferred to PARTY B will be net values, i.e the gross values less the deduction of the Operational Fee of 3 % of the tranche charged by Party A, established in 3.12-i). Depending on agreement with Intermediary PARTY A will also deduct the Intermediary Fee established in 3.12-ii).**

| DESCRIPTIVE OF THE FINANCING PHASES | | |
|---|---|---|
| AMOUNT TO BE FUNDED | US$ 50,000,000.00 | |
| FIRST TRANCHE OF FINANCING SHALL BE EXECUTED WITHIN 30 BANKING DAYS, AFTER PARTY A'S BANK RECEIVES BANK RECEIVES A BANK COURIER FROM THE PARTY B's BANK WITH HARD COPY OF THE SBLC AND THE SBLC IS VERIFIED AND ACTIVED | | |
| TRANCHE #01 - IN 30 BANKING DAYS AFTER PARTY A'S BANK RECEIVES HARD COPY OF THE SBLC AND THE SBLC IS VERIFIED AND ACTIVED | 20% | US$10,000,000.00 |
| TRANCHE #02 - IN 30 BANKING DAYS AFTER TRANCHE #01 | 20% | US$10,000,000.00 |
| TRANCHE #03 - IN 60 BANKING DAYS AFTER TRANCHE #01 | 20% | US$10,000,000.00 |
| TRANCHE #04 - IN 90 BANKING DAYS AFTER TRANCHE #01 | 20% | US$10,000,000.00 |
| TRANCHE #05 - IN 120 BANKING DAYS AFTER TRANCHE #01 | 20% | US$10,000,000.00 |
| **TOTAL AMOUNT OF FINANCING** | **US$ 50,000,000.00** | |

[REMAINING PART OF THIS SECTION INTENTIONALLY LEFT BLANK]

*PARTY A*　　　　　　　　　*PARTY B*

20/23

OPL-380379

AGREEMENT_EAM-SECTOR-1221-2022

*Final2*

| | GENERAL REPAYMENT DATA | | | | | SBLC ISSUED FOR 12 YEARS IN TOTAL ALTHOUGH RENEWING EVERY 1 YEAR AND 1 DAY |
|---|---|---|---|---|---|---|
| Amount | US$50,000,000.00 | Maturity | 12 years | FIXED INTEREST RATE | 4% | |
| Grace Period | 3 Years | Installments | 9 | CURRENCY | USD | |
| Date First Financial Payment* | TBD | * 1ˢᵗ DATE OF PAYMENT | TBD | INTEREST ON INITIAL AMOUNT | | |

*The date initial payment will be from the first payment of financing.

**REPAYMENT SCHEDULE:**

| Tranche | Date of Payment | Initial Balance USD | Principal Payment USD | Interest Payment USD | Total Payment USD | Ending Balance USD |
|---|---|---|---|---|---|---|
| 1 | 2023-N+1-31 | 50,000,000.00 | ----- | ----- | 0.00 | 50,000,000.00 |
| 2 | 2024-N+1-31 | 50,000,000.00 | ----- | ----- | 0.00 | 50,000,000.00 |
| 3 | 2025-N+1-31 | 50,000,000.00 | ----- | ----- | 0.00 | 50,000,000.00 |
| 4 | 2026-N+1-31 | 50,000,000.00 | 5,555,555.56 | 2,000,000.00 | 7,555,555.56 | 44,444,444.44 |
| 5 | 2027-N+1-31 | 44,444,444.44 | 5,555,555.56 | 1,777,777.78 | 7,333,333.33 | 38,888,888.89 |
| 6 | 2028-N+1-31 | 38,888,888.89 | 5,555,555.56 | 1,555,555.56 | 7,111,111.11 | 33,333,333.33 |
| 7 | 2029-N+1-31 | 33,333,333.33 | 5,555,555.56 | 1,333,333.33 | 6,888,888.89 | 27,777,777.78 |
| 8 | 2030-N+1-31 | 27,777,777.78 | 5,555,555.56 | 1,111,111.11 | 6,666,666.67 | 22,222,222.22 |
| 9 | 2031-N+1-31 | 22,222,222.22 | 5,555,555.56 | 888,888.89 | 6,444,444.44 | 16,666,666.67 |
| 10 | 2032-N+1-31 | 16,666,666.67 | 5,555,555.56 | 666,666.67 | 6,222,222.22 | 11,111,111.11 |
| 11 | 2032-N+1-31 | 11,111,111.11 | 5,555,555.56 | 444,444.44 | 6,000,000.00 | 5,555,555.56 |
| 12 | 2033-N+1-31 | 5,555,555.56 | 5,555,555.56 | 222,222.22 | 5,777,777.78 | 0 |

PARTY A                    PARTY B

21/23

OPL-380380

AGREEMENT_EAM-SECTOR-1221-2022
*Final2*

## EXHIBIT C

### PROJECT SUMMARY

**(Attached Separately – EXHIBIT C Project Summary "COLOMBIA & CANADA")**

*PARTY A*                    *PARTY B*                    22/23

OPL-380381

AGREEMENT_EAM-SECTOR-1221-2022
*Final2*

## EXHIBIT C

### PROJECT SUMMARY

**(Attached Separately – EXHIBIT C Project Summary "COLOMBIA & CANADA")**

*PARTY A*                    *PARTY B*                              22/23

OPL-380382