Timothy A. Scott (SBN 215074)
E: TScott@McKenzieScott.com
Marcus S. Bourassa (SBN 316125)
E: MBourassa@McKenzieScott.com
McKENZIE SCOTT, PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 202-7461

*Attorneys for Defendant*
*Carlos Manuel Da Silva Santos*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>CARLOS MANUEL DA SILVA SANTOS (1),<br><br>      Defendant. | Case No.: 3:23-cr-02507-RSH<br><br>**MR. SANTOS'S SENTENCING MEMORANDUM**<br><br>Date: May 16, 2025<br>Time: 9:00 AM<br>Courtroom: 3B<br><br>Hon. Robert S. Huie |

MR. SANTOS'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.      A YOUNG LIFE OF ACADEMIC & PROESSIONAL SUCCESS ..........1

   A.    "Perfect Childhood" ...................................................................1

   B.    Successful University Student-Turned-Professor.....................2

II.     A YOUNG BUSINESSMAN.......................................................3

   A.    A Unique Model for International Project Finance ...............3

   B.    A Business Built to Enable Worthy Projects .......................5

   C.    An Involved Investor with a Rapidly Growing Business .......7

III.    FLYING TOO CLOSE TO THE SUN LEADS TO FRAUD...................8

   A.    Fraud Driven by Desperation ................................................8

   B.    Under Extreme Pressure .......................................................9

   C.    Bad Company ..........................................................................11

   D.    Belief in Ethos's Long-Term Success....................................12

   E.    Carlos Lost Everything .........................................................15

   F.    A Path to Atonement .............................................................16

IV.     SENTENCING GUIDELINES ......................................................18

   A.    Section 3553(a)(6) Supports a Downward Variance from the
      Guidelines ...............................................................................19

   B.    The Additional Time Carlos Will Spend in Custody Supports a
      Downward Variance ...............................................................20

   C.    The Difficulty of the Time Carlos Will Spend in Custody Supports a
      Downward Variance ...............................................................21

   D.    Mr. Santos's Age, Potential, and Reentry Plan Support His Requested
      Sentence ..................................................................................23

V.      CONCLUSION...........................................................................25

MR. SANTOS'S SENTENCING MEMORANDUM

## I.    A YOUNG LIFE OF ACADEMIC & PROESSIONAL SUCCESS

Carlos built a successful academic path upon a positive childhood. A standout student and athlete adored by his parents, relatives, and friends, Carlos left his hometown of Leiria for Lisbon to enroll at the University of Lisbon. There, he found extraordinary academic success in economics and finance, following up his undergraduate studies with a master's degree and then an adjunct professorship. By all accounts, Carlos entered the world of business as a well-rounded, respected young man.

### A. "Perfect Childhood"

Carlos was born to upper-middle-class parents in Leiria, a midsized city in central Portugal. His mother worked as an Certified Public Accountant while his father managed an automobile dealership and repair center that he co-founded. Presentence Investigation Report, ECF No. 125 (hereinafter "PSR) ¶ 106. His sole sibling was his older sister, who moved to the United Kingdom while Carlos was in high school.



His sister, his mother, his father, and Carlos (right)

The "perfect childhood" with an "amazing" family is how Carlos recalls his youth. PSR ¶ 107. His mother echoes that Carlos "had boundless energy," was "very responsible," and "never caused [his parents] any concerns." Manuela Santos Letter, Ex. A-2 at 5. As his father puts it, Carlos was "[a]lways faithful to the

teachings of his parents" while also maintaining "a very active social life" and standing out as "a brilliant student." Carlos Jose Marques dos Santos Letter, Ex. A-3 at 10.

Carlos played various sports, travelled abroad, and received musical training. PSR ¶ 106. Through his schooling and extracurriculars, he formed strong bonds, many of which remain intact through today. Celso Pereira tells the court how, in high school, Carlos "managed to perfectly balance being serious, focused and proactive in class with being fun, comic and contributing with good humor without ever crossing the line." Celso Pereira Letter, Ex. A-5 at 16. Outside of school, Carlos also "earned the respect and admiration of every team member" on his soccer team through his effort and camaraderie. *Id.* He was a "reliable and valued friend," Bernardo Santos Letter, Ex. A-6 at 19, who was "always willing to help others," Luis Patricio Letter, Ex. A-7 at 21.

## B. Successful University Student-Turned-Professor

Carlos left Leiria after high school to attend the University of Lisbon's School of Economics and Management ("ISEG"). In June 2015, Carlos earned his undergraduate degree from ISEG in Economics. *See* Ex. B-1. He immediately enrolled into ISEG's master's program in Accounting, Taxation, and Corporate Finance, from which he graduated in early 2017. *Id.*; PSR ¶ 108. Throughout his time at ISEG, Carlos won scholarships and awards, including the award for "Top Student" in his master's program. *See* Ex. B-2; Ex. B-3 (merit-based scholarships).

Carlos accepted the offer of a teaching position at ISEG after completing his master's degree. The adjunct professorship built on teaching assistantships he held at ISEG from 2015 through 2017 while studying for his masters. *See* PSR ¶ 130. Carlos taught as a visiting professor (akin to an adjunct professorship in U.S. academia) at ISEG, providing instruction in various courses. Ex. B-4; *see also* PSR Objections at 6-7 (objecting to case agents' unsupported assertion that Carlos never taught at ISEG).

Carlos built strong bonds with his students. One student recalled how "Professor Carlos" "was always available to answer questions, to help, and to try to explain things in a practical way that was appropriate for the young students in his class." Carolina Carvalho Letter, Ex. A-9 at 29. Carlos stood out, according to his former student, for his ability to explain concepts in an easy-to-comprehend manner. *Id.* Another student recalls how he "consistently went above and beyond expectations" while "always in good spirits, wearing a broad smile, and radiat[ing] optimism." Cristiana Dias Letter, Ex. A-8 at 26; *see also* Joao Pinheiro Letter, Ex. A-31 at 105 ("always had a smile on his face and always wanted to teach").

## II.    A YOUNG BUSINESSMAN

As a student at ISEG, Carlos began to build business connections. He was particularly drawn to international finance, and he found early success in assisting business owners obtain financing from third parties. Carlos's creation of Ethos Asset Management ("Ethos") permitted him to build on his connections and himself become a funder of worthy international infrastructure projects.

### A.  A Unique Model for International Project Finance

Ethos's corporate focus was international project finance. Ethos employed a model where intermediaries were compensated for identifying projects that met the corporation's funding parameters. Specifically, as typical for project-finance firms, Ethos sought infrastructure and industrial projects that offered long-term, predictable positive cash flows. *See generally* Tim Vipond, *Project Finance – A Primer*, Corporate Finance Institute (last visited Apr. 7, 2025), https://corporate financeinstitute.com/resources/commercial-lending/project-finance-primer/. (describing project finance's focus on projects with "low technological risk, a reasonably predictable market, and the possibility of selling to a single buyer or a few large buyers based on multi-year contracts (e.g. take-or-pay contracts)."). Ethos's value proposition was that it would provide upfront capital within one to two years (via tranches) to fund approved projects. In turn, Ethos's borrowers

promised to pay back Ethos on a payment schedule that began several years after funding and stretched up to twelve years into the future. The benefit to Ethos's clients was two-fold: first, clients received loans with generous terms on which repayment was not due until their projects became cash-flow positive; and, second, clients limited the exposure of their non-project-related assets should the project fail. *See id.* ("the new project and the existing firm live two separate lives. If the project is not successful, project creditors have no (or very limited) claim on the sponsoring firm's assets and cash flows.")

Ethos's distinguishing factor in the market was its ability to finance projects that other financial institutions (namely traditional banks) would not. As banking expert Joshua Larson's noticed testimony makes clear, Ethos's model "fill[ed] a market niche: provide credit to small- and medium-sized borrowers whose projects and financial profile put them outside the range of prime-lending banks." ECF No. 76-1 at 3. Ethos focused on smaller projects from unique borrowers that otherwise may have struggled to secure financing. *Id.* Borrowers "that might otherwise have struggled to find backing" were thus able to obtain funding. *Id.* at 3-4.

Carlos saw his company's niche as funding projects with impacts that would go unrealized but-for Ethos's funding. Pom Vattasingh details to the Court her experience with Carlos and Ethos as she worked to build an infrastructure project in Mozambique, which would "help one of the world's poorest countries, providing necessary tax revenues, employment and training for locals." Pom Vattasingh Letter, Ex. A-10 at 34. The project's "positive social and economic impact . . . was of great interest to Carlos." *Id.* Carlos wore a shirt from the project "with pride" while he "followed the project closely and funded as promised." Even though their funding relationship had problems and Ms. Vattasingh recognizes "Carlos committed serious mistakes and broke the law," she "do[es] not believe that he entered into our agreements with the intention of misleading us for his personal financial benefit," *id.*, a sentiment echoed by another leader of the project who "strongly doubt[s] that

Carlos entered into agreements with the intention of deception and fraud." Jose Pires da Fonseca Letter, Ex. A-11 at 37. Carlos's desire to see the underlying projects be successful carried through in his actions as well. *See, e.g.,* Ex. F at 4 (Carlos "the area Carlos visited in Cairo was far from a vacation, and not a nice place to visit. . . . The deal with Plastic Bank was done, and Carlos had the money. Carlos was also in the middle of audits with the company. Nino questioned why Carlos would pay to go to Cairo if he was only interested in the money").

Despite the money Ms. Vattasingh lost from her relationship with Carlos, she emphasizes that "Carlos is young, brilliant with a good heart and strong commitment to do good." Pom Vattasingh Letter, Ex. A-10 at 35. It was clear to those around Carlos that he possessed an "unwavering belief in providing finance to affect people's lives, whether that was economies, communities or individuals affected by his investment." David Kimpton Letter, Ex. A-20 at 69.

In addition to filling a funding niche, Ethos's model provided desirable features for borrowers. Corporations were able "to avoid purchasing any true equity in the project," whereby pledged moneys reflected as an asset (as opposed to a liability) on borrower's balance sheet. ECF No. 76-1 at 6; *see also* Pom Vattasingh Letter, Ex. A-10 at 34 ("Carlos was engaging and, impressively, came up with an off balance sheet financing structure through a separate company, TSPT."). The use of Special Purpose Vehicles (common in project finance) "allowed funding" of the client's project "without consolidating the debt on [the parent company's] books." Ex. A-10 at 34. The variety of sophisticated companies that engaged with Ethos for loans makes clear that the company's funding model was an attractive one for corporations eager to make use of their dormant assets while not having to invest equity in their new undertakings. ECF No. 76-1 at 7.

### B. A Business Built to Enable Worthy Projects

Ethos's model differed from traditional investment banks, but it was not inherently risky. Indeed, Ethos's "use of paid capital/equity, accumulated returns

from trading/projects financed, credit lines back by collaterals, and other debt instruments align[ed] with industry practices." ECF No. 76-1 at 1. Ethos's model was designed so that each project financed would generate profit in two ways: First, the interest rate on the loan accrued in Ethos's favor; by year twelve, clients would have paid back much more than the funds Ethos had lent them. Second, Ethos could make use of the client's collateral to generate returns through independent trading. *Id.* Such practices both aligned with industry practices and permitted Ethos to mitigate the risk that clients might default on their loans. *Id.* In essence, Ethos's trade off was that it took on more risk by backing less-credit-worthy borrowers, risk that was mitigated by its use of client collateral to invest independently. *Id.* at 1-2.

Indeed, Ethos executed a trading strategy that bore positive returns. Assessment of Ethos's successes has to take into account that Carlos believed Sean Winston was investing Ethos's funds in the manner that Carlos and Mr. Winston discussed. Unbeknownst to Carlos, however, Mr. Winston was lying to Carlos about returns when, in fact, not investing Ethos's funds. Mr. Winston's efforts to defraud Carlos caused Carlos (and Ethos) to (alongside his own criminal misrepresentations) profoundly misjudge Ethos's capacity to fulfill tranche obligations to clients. Carlos was not aware that Ethos's trading funds were (1) substantially illiquid because they were being fraudulently stolen by Mr. Winston and (2) not earning the nearly 150% annual returns Mr. Winston claimed.[1] Meanwhile, Ethos was earning positive trading returns from other accounts in both

---

[1] Unbeknownst to Carlos, Mr. Winston sent Carlos fraudulent bank statements *significantly* inflating the returns on Ethos's investments – money Mr. Winston was actually stealing for himself. Mr. Winston claimed in a falsified March 28, 2023, statement to be holding $18.6 million of Ethos funds, which he later (falsely) claimed earned nearly $10 million by August 12, 2023 (at $27.2 million) – a 46% return in less than six months. *See* Exhibits E-4 & E-5. Thus, Mr. Winston falsely claimed to Carlos that Ethos's investment account were on track to more than double (earning approximately 149%) annually. Or, as Mr. Winston expressly claimed "8% each month." Exhibit E-6.

the United States and Turkish accounts. Declaration of Joshua Teeple ("Forensic Accountant Decl.") ¶¶ 13-14.

When forensic accountant Joshua Teeple examines Ethos's bank accounts, he sees "a company engaged in the activities expected of an international project finance company, including making payments on secured loans, investing in financial instruments, and paying operating expenses." Forensic Accountant Decl. ¶ 15. Ethos operations aligned with what would be expected for its purpose and scale: Ethos received incoming lines of credit, disbursed funds to clients, paid business expenses consummate with Ethos's scale, and executed investment strategies. Forensic Accountant Decl. ¶¶ 16-17. Nor is there evidence Ethos was devaluing assets, robbing its coffers to enrich shareholders, or otherwise operating as a pass-through get-rich-quick scheme for Carlos. Forensic Accountant Decl. ¶ 17. It was a business operating with a goal of sustainable, long-term profitability.

### C. An Involved Investor with a Rapidly Growing Business

Carlos prides himself on the close relationship he built with clients. To ensure capital was properly deployed into the approved project as per contract, Ethos required a close working relationship with each client, a norm in the project-finance industry. *See* ECF No. 76-1 at 5-7 (describing Ethos's financing model). Audits are a norm in project finance, and Ethos was no different. *Id.* Indeed, Ethos's contracts included audit clauses upon which payment of subsequent tranches were expressly conditioned. Keeping track of client's financials, compliance with borrowing terms, and evolving business needs occupied much of Carlos and Ethos's attention.

Ethos's model found great traction and the company grew quickly. In its five years of operation prior to Carlos's arrest, Ethos signed close to one-hundred financing agreements with corporations across five continents. Many of those deals were "legitimate project financing agreements with clients in the United States and around the world," in which Carlos "disbursed money to those clients to finance projects." ECF No. 121 at 4.

Ethos' clients were sophisticated business-people whose lawyers and bankers vetted the proposed deal structures and negotiated for months over terms. The process of applying for a loan from Ethos was difficult and time-consuming, setting aside the negotiations over terms. *See, e.g.,* Ex. F (Report of Interview with Nino Petoia). And as the business grew, so did its complexity.

The result was that Carlos was constantly busy, often forgoing sleep in order to review proposed deals, meet with clients, and help Ethos's internal processes run smoothly. *See, e.g.* Ex. A-13 ("Stopping to eat was a battle between us. He would rather grab a hamburger and continue working on the computer. I honestly don't know how he managed it"). In the 12 months before his arrest, Carlos appears to have sent more than 19,000 unique emails from his Ethos address, <u>an average of more than 50 every single day including weekends</u>. Carlos was increasingly stretched thin – too thin.

### III.    FLYING TOO CLOSE TO THE SUN LEADS TO FRAUD

Success came quickly to Carlos. Ethos was growing, with clients attracted to Ethos's unique funding model that enabled realization of projects that had hitherto struggled to secure backing.

As Ethos grew, Carlos came to rely on others to help him lead the company. Carlos's academic prowess and early successes, however, had not prepared him to deal appropriately with the complexities of finance. He failed to find trustworthy partners to help manage Ethos. Instead, he grew increasingly close to Mr. Winston—an irresponsible custodian of Ethos's money and serial fraudster—as well as others who relied on fraud to succeed in their endeavors. Carlos, just a few years removed from university, impressionable, and eager to succeed, unfortunately learned the wrong lessons.

#### A. Fraud Driven by Desperation

Ethos's obligations grew, and the corporation struggled to keep up. Ethos struggled to secure underwriting from some third-party lenders.  Some clients failed

to comply with Ethos's terms of lending. Money transfers between jurisdictions proved more difficult than anticipated.

Carlos hired or partnered with individuals with finance experience from a variety of countries. But their expertise proved insufficient to keep up with Ethos's increasing complexity. Carlos's hubris also prevented him from delegating or seeking help. Carlos, in his mid-twenties, for the first time in his life faced true difficulty, the kind of difficulty that cannot be solved by an all-nighter, studying harder, or making small changes. He, and Ethos, was in over his head, and he chose the wrong path.

In retrospect, it is clear to Carlos that he should never have made false representations and illegally altered documents. When he took those steps, he told himself that they were small lies in service of the long-term success of Ethos. He did not set out to run a fraudulent company. But, as Ethos's struggles continued, he learned the wrong lessons and made wrong decisions. Clients and lenders would not question big balance sheets, he realized, so, when questions got tough, instead of admitting that Ethos was struggling, Carlos lied.

### B. Under Extreme Pressure

Carlos's life before arrest was defined by success. His family saw him as an academic star. His students loved him. He had always succeeded, and the pressure to succeed was high. His nonstop work at Ethos should be understood



MR. SANTOS'S SENTENCING MEMORANDUM

as his attempt to continue to succeed; he could never admit his faults or when he had gotten in over his head.

Perhaps Carlos's stress is best seen as something that accumulated over the course of his young life. His father, for who he is named, saw in his son a "brilliant student" who "achieved the best grades of all time at the Lisbon School of Economics and Management of Universidade de Lisboa, Portugal." Carlos Jose Marques dos Santos Letter, Ex. A-3 at 10. His parents' friends similarly labeled him "one of the best students of all time." Antonio Cabeco Letter, Ex. A-47 at 152. To his students, he was one of the "geniuses." Carolina Carvalho Letter, Ex. A-9 at 30. Of course, parents, friends, and students like to exaggerate. But the Court should also recognize that Carlos, not yet thirty, was under great pressure to succeed and live up to the superlative terms in which those closest to him viewed him.



Ms. Vattasingh, a former client, recognizes that Carlos sometimes "seemed to be overwhelmed and out of control." Ex. A-10 at 34. Because Carlos functioned "as the sole operator" in an expanding company for which "he needed to be in touch with operators around the world," the result was that "[h]e hardly ever slept." Another former client of Carlos, Jõao Décio reflects that Carlos "works harder than anyone I have ever seen." Joao Decio Sousa da Silva Letter, A-13 at 42. Whether day or night, Carlos was "always working like a madman." *Id.* Upon reflection, Mr. Décio "honestly do[es]n't know how [Carlos]

managed" to keep up his pace of work. *Id* at 43.

Another one of Carlos's clients recognizes Carlos's "most notabl[e]" shortcoming was his "lack of experience as he was of very young age and desire[d] to control every little detail, especially [the] flow of his business, rather than to organise it properly." Mehmet Karamehmet Letter, Ex. A-12 at 40. The result was an "extremely hectic way of doing business, rather than a premeditated intent to defraud." *Id.* Carlos "was always busy" and solely "dedicated to his phone at times." Robert Roy Letter, Ex. A-32 at 108.

Ethos grew quicker than Carlos anticipated. He had always been the golden child, the one that everyone looked up to. As his company grew, he tried to live up to expectations. In the course of doing so, he committed the crime to which he has pled guilty.

### C. Bad Company

Carlos in no way denies his criminal conduct. But, if one zooms out, it becomes clear that the company Carlos kept fueled the fraud to significant degree.



Elias Achilleos

Carlos was the youngest amongst Ethos's leadership. Individuals who he considered role models in Portuguese, European, and American business communities turned out



Leandro Fernandes

to be less-than-honest operators. *See, e.g.,* ECF No. 77-1 at 3 ("Leandro acted like a father figure to Carlos"). Whereas a positive mentor would have spotted Carlos's errors, Ethos's inner circle frequently proposed or participated in the incredible claims Ethos (and Carlos personally) made to banks and clients about Ethos's financial positions.

No one contests (and the plea agreement makes clear) that Ethos entered into legitimate project financing agreements and disbursed monies as promised to clients who saw the benefit of the model. *See, e.g.,* Ex. E-3 ("It was an amazing year . . . we are on our way to create an amazing tech enterprise," responding to Carlos's notice of the last tranche being wired). But, at other times, Carlos and his co-conspirators duped clients and banks via doctored financial statements. Carlos's actions went, sadly, both unchecked and unquestioned. In fact, his actions were often at the suggestion of other senior leaders at Ethos, who made similar false statements themselves and independently. *See, e.g.,* Ex. E-1 at 2 (Co-defendant and Ethos senior leader Mr. Achilleos suggesting "A letter from one lawyers may give some pause . . . I'm sure other companies do it. . . . It can work even for a couple weeks."); *id.* at 3 (Mr. Achilleos indicating that disbursing a loan to a client would be "wasted money" while noting "they would still have to repay us if we defaulted later.").

The Bad Company Carlos kept also exacerbated the fraud in ways Carlos could not anticipate, because it meant his colleagues (like Mr. Winston) were simultaneously self-interestedly pursuing their own profits. Including, in the case of Mr. Winston, going so far as to defraud Carlos into thinking Ethos had more assets available than it really did.

Surrounded by individuals that he viewed as experienced businessmen, Carlos expected guidance and wisdom. Instead, the *wunderkind* received misguidance and unwise counsel. No Daedalus stepped up to warn Carlos that he was flying too close to the sun. Carlos accepts responsibility and asks forgiveness for his errors. But he also asks the Court to consider his age, his relative inexperience, and the unwise counsel he received.

### D. Belief in Ethos's Long-Term Success

Carlos did not create Ethos with the dream of defrauding clients, clients, investors, or banks. Indeed, when clients transferred large sums into Ethos's control,

the overwhelming majority of those funds were used to service Ethos's obligations to clients. This is not a case where the greedy fraudster bilked investors to buy himself a luxurious home, fancy cars, or watches. Ex. A-13 ("Luxuries? I don't believe they are part of his vocabulary").

The fact that Carlos did not personally enrich himself from Ethos should be taken into account by the Court in sentencing him. Upon his arrest, Carlos's personal bank accounts had minimal funds compared to the scale of funds entrusted to Ethos by clients. As previously discussed in connection with bail litigation, there is no indication that he hid away money waiting for him in a secret account. Rather than raid the business's accounts, Carlos tried to steer the entire enterprise through to a longer-term success – a time when Mr. Winston's investments would bear fruit and former clients would begin servicing their legitimate loans so that accounts receivable could fund tranches.

Carlos was not planning to disappear from Ethos, taking millions with him and leaving his corporate clients high and dry. His fraud was committed in the service of continuing to grow Ethos into a successful company. Carlos believed that if Ethos could make good on its commitments, the long-term accounts receivable would make Ethos a successful company. That belief, however misguided and ill-conceived, is reflected in his private correspondence with Mr. Achilleos, his co-defendant here who has never been arrested, where Carlos repeatedly espoused his belief the business would work if only they continued to perform on their loan obligations to clients while growing their trading investments (where Mr. Winston was defrauding him). *See, e.g.,* Ex. E-1 at 5 ("I am confident" "We only need to perform" "We have trading going well" "And we need only this"). One thread, which the government has repeatedly relied upon as an honest, deeply incriminating exchange with Elias from 2020 about the "Ethos Model," describes using "delay" and paying "less than agreed," but how the business can succeed over the longer term. PSR ¶ 34. But immediately after that exchange, Carlos, speaking to the more

experienced man, Mr. Achilleos, wondered aloud if they were doing something wrong before immediately reiterating their good intentions – to perform their tranche obligations and fund the projects:



Ex. E-2 at 8. Mr. Achilleos's response: "It's not illegal." *Id.*

In the toxic ecosystem of these professional relationships, Carlos was doing things the wrong way in the hope it would work out right and enable Ethos to perform its loans in the long term. And he got consistent reinforcement from those around him.

He was doing it the wrong way, by using lies to pave over Ethos's economic turmoil. But far from pocketing any client collateral he could obtain, Carlos was rejecting most applicants for financing. Ex. F at 2 ("Nino had between thirty and forty potential projects that never progressed past his desk due to Ethos' strict criteria"), at 4 ("Carlos decided not to proceed with Oliver London the day before they were supposed to place collateral. Ethos was expected to receive 2.5 million, but Carlos turned it down because he thought the client would be difficult to work with for ten years. . . . he believes Carlos would have let the project continue if he were only interested in their collateral"). His crime should not obscure Carlos's

simultaneous goal of funding worthy projects, supporting his corporate clients, and creating a unique (and legitimate) international project finance company. *Id.* at 10 ("We will create a new Goldman . . . I real believe that we can make this happen" "I think our structure is correct and good"); *see also,* ECF No. 77-1 ("Elias was the only employee Carlos fully trusted").

Carlos took too many risks, committed fraud in hopes of driving Ethos to long-term success, and is now paying the price for his crimes. But his intentions, of fostering a successful project financing company, should be taken into consideration. Ethos was not founded to be a fraud. If that had been his goal, he could have simply pocketed tens of millions of dollars in cash backed by client collateral and attempted to disappear rather than continuing to disburse it to other clients, or funding the company, or giving it to Sean Winston unwittingly enabling him to steal it.

Carlos is a young man who was surrounded by older men who employed grossly misguided tactics in an attempt to steer Ethos to sound financial footing. He lied to attempt to live up to everyone's expectations, including the unrealistic expectations he helped set. But he has learned his lesson, deeply regrets his actions, and will never again commit such sins.

### E. Carlos Lost Everything



Since his arrest in November 2023, Carlos has lost virtually everything. His arrest and conviction have been the subject of understandable attention from clients,

bankers, friends, and business contacts around the globe – profoundly impacting his ability to work in the future. Carlos had been married for only a couple of months when he was arrested and each day he is incarcerated diminishes his family's hope to one day have children.

Meanwhile, the Department of Justice's Press Releases have helped facilitate news coverage in the United States and closer to his home in Portugal[2] such that his worst mistakes in life will follow him forever in the court of public opinion.

It is a testament to the positive impacts he has had on others in his life that, since his arrest, conviction, and 18 months of continuous custody in an American jail, so many people continue to care about him and support him. *See generally* Exs. A-1 through A-57.

### F. A Path to Atonement

Carlos's arrest and conviction came as a shock to many. Letters of support submitted to this Court on Carlos's behalf, however, make clear that Carlos has much promise. Even those hurt by Carlos's actions recognize that he should not be defined by his crimes. He is a young man with much promise. If given a short sentence by this Court, Carlos will emerge with many years left to do good in the world. Carlos recognizes he will have to prove himself to his family, friends, and former associates, and his supporters recognize that redemption through good works is a path on which Carlos is ready to embark.

Since pleading guilty, Carlos has attempted to be an open-book with companies claiming to have lost money by virtue of their dealings with Ethos, but

---

[2] *See e.g.* https://www.publico.pt/2025/04/17/sociedade/noticia/historia-carlos-santos-milionario-portugues-confessou-golpe-financeiro-enfrenta-justica-eua-2129857 & https://executivedigest.sapo.pt/noticias/quem-e-carlos-santos-milionario-portugues-confessa-golpe-financeiro-e-enfrenta-ate-30-anos-de-prisao-nos-eua/

MR. SANTOS'S SENTENCING MEMORANDUM

with his own, few assets frozen and subject to forfeiture,[3] his ability to financially atone is limited. Still, he has proactively given what support he can to aiding companies that lost money. Two such companies (through their respective counsel) have written letters for the defense team describing Carlos's efforts since pleading guilty. Specifically, Sector Resources (a victim identified in the plea agreement) and ST Properties (a company which has lost some of the collateral it placed) have each written letters. They attest that, since pleading guilty, Carlos "has been very helpful" in cooperating with their investigations and separate suit, including by "directing his former law firm, who has extensive knowledge of Ethos's operations and finances, to provide all of its documents to ST Property as the company searches for assets that may be used." Exhibit A-60 (Counsel for ST Properties). Sector Resources, for its part, similarly explains that Carlos "quickly agreed to assist the Sector Companies," "waived attorney-client privilege," directed "his former counsel to produce their files," and proactively provided (through undersigned counsel) "his communications with East West Bank" as well as "with his former lawyers, Robin Nunn, Linklaters LLP, and Morgan Lews & Bockius." Exhibit A-59 (Counsel for Sector Resources). Although they have not yet been able to recover assets by other means, they "acknowledge and appreciate Mr. Santos' assistance in their efforts to recover their collateral." *Id.*

Carlos's family recognizes that "he has learned with his mistakes." Carla Santos Letter, Ex. A-4 at 14. His wife emphasizes "that he has so much good left to give to this world." Eylem Santos Letter, Ex. A-1 at 3. His arrest and this case have "shaken him so much that it has even robbed him of his health," but he has a positive

---

[3] This includes a personal account Carlos held in the Isle of Mann. *See* PSR ¶ 138(d). The undersigned counsel is unaware of any evidence linking the personal funds in that account to the crime here, it appears to have been frozen after the bank learned of Carlos's arrest and proactively contacted the FBI. Nonetheless Carlos has consented to the forfeiture of these funds in service of his restitution obligations.

MR. SANTOS'S SENTENCING MEMORANDUM

work environment with his parents open to him and his family "can see from Carlos' experience over the last few months that he never wants to go through such an ordeal and that he wants to honor his family by being an upright example," going forward. Maria Santos Letter, Ex. A-2.

Repairing lost trust is top of Carlos's current mindset. His sister emphasizes that "when released he will look to give back to our caring parents and his loving wife for all their unconditional support" while also "find[ing] a way to contribute positively to the world." Carla Santos Letter, Ex. A-4 at 14. Similarly, his father sees an "unequivocal ability to integrate into society" ahead. Carlos Santos Sr. Letter, Ex. A-3.

Even putative victims of Carlos's crime request Carlos receive a "reduced sentencing which will allow him to make amends." Pom Vattasingh Letter, Ex. A-10 at 35; *see also* Mehmet Karamehmet Letter, Ex. A-12 at 40 ("I also believe that Carlos is the only person who can strive to make things right to everyone involved, if provided with the chance and freedom to do so."). They recognize that "[i]t would be unfortunate for [Carlos's] talent to be wasted spending too much of his remaining life in jail." Pom Vattasingh Letter, Ex. A-10 at 35.

## IV.    SENTENCING GUIDELINES

The parties agree about Carlos's sentencing guidelines range for Count 1 before any variance, 78-97 months, is significantly higher than necessary. Carlos will serve 24-months consecutive to any sentence on Count 1 because his fraud involved identity theft. Thus, the Government recommends a two-level variance and a low-end sentence of 63 months for Count 1 (a total of 87 months with the identity theft added consecutively). Probation, for its part, recommends the equivalent of an approximately five-level variance downwards. Thus, all involved agree that the guidelines overstate the appropriate sentencing range, the question is how far down the Court should vary.

Although    the    defense    joins    Probation's    and    the    Government's

recommendations for a downward variance, neither goes far enough. In light of the mitigating circumstances, profound punishments already exacted (through the press, financially, in the minimum-mandatory term of 24 months, and based upon Carlos's uncommonly difficult experience of incarceration and detention), and other relevant 3553(a) factors, a cumulative sentence of 30 months is appropriate.

### A. Section 3553(a)(6) Supports a Downward Variance from the Guidelines

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" weighs in favor of a lenient sentence. 18 U.S.C. § 3553(a)(6). The chart below, obtained United States Sentencing Commission data analyzer shows sentences issued from 2015-2023 under Guideline § 2B1.1 for defendants with a criminal history of 1:



The figure includes the 36,346 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.

U.S. Sentencing Commission: Interactive Data Analyzer (Sentencing Outcomes: Sentence Length) (last visited Apr. 8, 2025), https://ida.ussc.gov/analytics/saw.dll? Dashboard. Nearly seventy percent of those sentenced under § 2B1.1 receive a sentence of under two years and ninety-one percent receive a sentence of under five years. *Id.*

Furthermore, looking only at this and related cases, the Court recently sentenced a co-conspirator, Sean Winston, to 18-months in custody.[4] Mr. Winston not only played a significant role in this offense, but was discovered because he committed other unrelated PPP-loan fraud against the United States. *Id.* at ECF No. 8 (November 30, 2023). Meanwhile, although there is no evidence of Carlos treating Ethos bank accounts as his own or pocketing millions from client collateral, Mr. Winston *was* directly stealing from Ethos and pocketing millions. Unbeknownst to Carlos, Mr. Winston had misappropriated approximately $10 million in Ethos's capital, significantly exacerbated Carlos's crime in ways Carlos did not know because Mr. Winston was lying to Carlos about the availability of Ethos's investment capital and falsely claiming significant earnings. *See* Exhibits E-4 through E-6.

## B. The Additional Time Carlos Will Spend in Custody Supports a Downward Variance

The declaration submitted by Joel Sickler, an expert with over 45 years of experience in Bureau of Prisons' policies, illuminates how Carlos's time in custody will be longer and harsher than a similarly situated defendant, solely by reason of Carlos's Portuguese citizenship. These mathematical realities are not accounted for in the Guidelines and counsel strongly in favor of a downward variance.

First, Various BOP policies will result in Carlos spending <u>ten to twenty percent longer in custody than a citizen</u> would. Declaration of Joel A. Sickler ¶¶ 21-27. If the Bureau of Prisons forces Carlos to enter into the Institutional Hearing Program — a program that the previous Trump administration expanded to the "maximum event possible," *Memorandum from John Kelly to Department Directors, Subj: Enforcement of the Immigration Laws to Serve the National*

---

[4] *United States v. Sean Winston,* Case No. 3:23-cr-02441-RSH (S.D. Cal.) ECF No. 45 (judgment entered May 5, 2025).

*Interest*, DEP'T HOMELAND SEC. (Feb. 20, 2017), https://www.dhs.gov/archive/publication/enforcement-immigration-laws-serve-national-interest — he will have a final order of deportation lodged against him while still in BOP custody and thus be capped at a fifteen percent reduction of his sentence. Declaration of Joel A. Sickler ¶ 27.

In addition to the caps and unavailable sentence-reducing-credits Carlos will experience compared to analogous U.S. citizen inmates, he will also have to spend time in immigration custody once his criminal sentence concludes. Immigration custody is similar in nature to criminal custody: prisoners are transported in handcuffs and leg irons, there is no programming, medical treatment is insufficient, and a heightened risk of assault exists. *Id.* ¶¶ 32-34. Additionally, while in Immigration and Customs Enforcement custody, Carlos will likely be held in a county jail or detention facility with well-documented unsanitary and unsafe conditions, including unsanitary living spaces, deficient medical and mental health care, and sexual assault by staff. *Id.* at ¶¶ 35-44. Despite not contesting his removal, Carlos will likely spend <u>multiple months in these conditions before being transported to Portugal.</u> *Id.* at ¶ 33. This incarceration is in the nature of a criminal penalty on top of that imposed by the Court – if Carlos had not been sentenced to prison, he could voluntarily depart to his home country without ever entering immigration custody.

In total, depending upon the length of his custodial sentence, Carlos's non-citizen status will make him spend up to 1.5 years longer in prison as compared to a U.S. citizen with the same sentence. *Id.* at ¶ 45.

### C. The Difficulty of the Time Carlos Will Spend in Custody Supports a Downward Variance

In addition time Carlos will spend behind bars because of his non-citizen status, the day-to-day experience of his incarceration will be more difficult because non-citizens are <u>ineligible for minimum-security facilities.</u> *Id.* ¶ 6. Normally, a

prisoner such as Carlos, with a non-violent conviction, no prior convictions, and no outstanding detainers would be designated to a BOP minimum-security prison camp. *Id.* ¶ 9. All "deportable aliens," however, are ineligible for minimum-security camps and are instead placed at a low-security prison. *Id.* at ¶¶ 10-11.

Low-security prisons are significantly harsher environments than minimum-security camps. Low-security prisons have walls lined with concertina wire, metal gates, and tightly controlled movement; camps are campus where individuals have free movement, relatively low staff-to-prison ratios, and minimal, if any, fencing. *Id.* ¶ 12; *About Our Facilities*, Bureau of Prisons (last visited Apr. 8, 2025), https://www.bop.gov/about/facilities/federal_prisons.jsp. Unlike camps, federal low-security prisons are overcrowded, with small cubicles, significant waits to use sanitation facilities, constant noise and light, and frequent interruption to sleep. *Id.* ¶¶ 13, 16. Furthermore, the inmate population at low-security prisons are often serving decade-plus-long sentences, likely have violent priors, and have been deemed a security or flight risk, while those held at camps are (like Carlos) generally first-time offenders incarcerated for non-violent conduct. *Id.* at ¶ 18. Rates of serious assault are 5.5 times higher in the types of prisons where Carlos will be held as compared to where similar U.S. citizen inmates are held. *Id.* at ¶ 19. Finally, and critically for Carlos, who stays in close contact with his wife, parents, and sister, visitation is much easier and less regulated at camps than low-security prisons. *Id.*

Unfortunately, solely because of his non-citizenship status, Carlos has zero chance of serving any of his sentence in a camp. Instead, based solely on his deportability, he will be denied the rehabilitative opportunities of a prison camp and instead housed alongside those with violent priors.

Meanwhile, Carlos <u>has already experienced unusually traumatic hardships in prison</u> having nothing to do with his offense or non-citizen status. During the preceding 18-months in custody, Carlos was present while another inmate was

*stabbed* in a shower next to him. PSR ¶ 119. Separately, Carlos spent time in an Oklahoma cell where a cellmate, whom Carlos believed had *attacked a prior cellmate*, used drugs openly – Carlos's first exposure to such things and first significant fear for his own life. *Id.* ¶ 120. These incidents coupled with the overall trauma of being isolated far from his family, let alone anyone who speaks his native language, have caused him to contemplate killing himself. *Id.* ¶ 121.

The Court should vary downward in sentencing Carlos in recognition of the difficulties he has already faced and will face in prison going forward.

### D. Mr. Santos's Age, Potential, and Reentry Plan Support His Requested Sentence

Carlos turned thirty years old in jail. He is still a young man. His academic successes demonstrate that he holds great potential. Meanwhile, the fact he still maintains a robust support network after being convicted of this crime and serving 18 months in jail is a testament to the lasting positive influence he has had on many people in the past.

Meanwhile, since he has been in custody, his days have not been idle. He has used the time demonstrating his continued passions and desire to help others, even under dire circumstances. Carlos's conduct in jail has attracted the uncommon support of other detainees, whom he taught classes like he had done at university in Portugal:

> He always tried to help people, and he helped all of us. <u>In prison, he created a small school</u> where he taught Economics and English. He was an excellent teacher, always explaining things well. I learned many things in English, and at that time, we were about 15 inmates. <u>We would forget where we were. I was one of them.</u>

Noe Santos Letter, Ex. A-56 (emphasis added). As another detainee echoes, "I have felt fortunate to have his friendship because he is a good and sincere person . . . It deeply pains me to see what is happening . . . he is in a very depressed state." Jesus Estrella Letter, Ex. A-57.

There is nothing new about Carlos's instinctive dedication to others. *See, e.g.,*

- as a child, "Carlos would accompany his mother on visits to the institution and play with the service users (citizens with intellectual disabilities and other associated conditions) without any discrimination. . . . He . . . interacted with them with affection, respect, and understanding," Ex. A-28.

- "he would always come down to carry the groceries for me so I wouldn't have to climb the stairs. In the same building lived an elderly lady (now deceased), and besides helping her carry groceries, he also kept her company, because she often felt lonely. I witnessed this myself." Ex. A-45.

- as an "extremely busy professor . . . he made a point of being available to everyone, even if it meant delaying an appointment or sacrificing part of his already full schedule. Ex. A-8.

- "I liked that I would be given as much time and attention as his other activities such as being on international TV channels . . . knowing a bully or 'alpha male' with an inflated opinion of themselves when I see one – Carlos isn't one of them." Ex. A-20.

- "when I lost my husband. I was navigating an incredibly difficult time—emotionally and mentally—when I received a call from Carlos. At that point, we were not close friends. We knew each other professionally and had mutual respect, but <u>his call came simply because he cared</u>. He didn't try to offer solutions. <u>He listened</u>. He gently offered support, saying I could reach out if I ever needed anything—even though it wasn't his place or responsibility. That simple gesture of compassion, offered quietly and without expectation, meant more than I can express." Ex. A-21 (emphasis provided).

Carlos knows he will have to start his professional life anew when he is released from custody. As his sister told the Probation Officer, "he w[ill] learn from his mistakes and make a positive impact on society upon his release." PSR ¶ 113.

Upon release from prison and returning to Portugal, Carlos plans to move to his hometown of Leiria and live with or near his parents. PSR ¶ 114. He recognizes he will be unable to have a career in finance, and he hopes to turn his attention to other ways to be productive in society. He recognizes that his fraud conviction may bar him from some forms of employment, but Carlos is committed to living a productive life upon release.

MR. SANTOS'S SENTENCING MEMORANDUM

Similarly, Carlos's friends "are all waiting for the day when we can hug him again, tell him how much we missed him, and remind him that no matter what, he will always be loved and important." Celso Pereira Letter, Ex. A-5 at 17. They do not pardon him of his wrongs, but rather they realize that, as imperfect as he may be, Carlos will always be supported by his community.

Carlos recognizes that the road ahead will not be an easy one. He and his wife hoped to have children. If Carlos is given a lengthy sentence, that may no longer be possible. Similarly, Carlos's parents are aging, and a long sentence would result in him only reentering their daily lives once they have lost some of their physical vigor. More broadly, he must regain the trust of his family and friends. Pleading guilty was the beginning of accepting responsibility for his errors. The harder task, Carlos knows, however, will be proving to his loved ones that he deserves their trust.

## V.    CONCLUSION

For the reasons contained herein, Carlos respectfully requests the Court sentence him to 30 months.

Respectfully submitted,

McKENZIE SCOTT, PC

Dated: May 7, 2025          By:     *s/Marcus S. Bourassa*
                                    MARCUS S. BOURASSA
                                    TIMOTHY A. SCOTT
                                    *Attorneys for Defendant*
                                    *Carlos Manuel Da Silva Santos*

MR. SANTOS'S SENTENCING MEMORANDUM