# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>CARLOS MANUEL DA SILVA SANTOS,<br><br>     Defendant. | Case No.: 23-CR-2507-RSH<br><br>**DECLARATION** |

I, Brian Holerud, pursuant to 28 U.S.C. § 1746, declares and says the following under penalty of perjury:

## I.    Introduction

1.    I am a Special Agent with Homeland Security Investigations and have been since June 2018.  I am currently assigned to a financial crimes and money laundering task force in San Diego, California focused primarily on international illicit finance, cross-border financial transactions, and violations of the Bank Secrecy Act by individuals and corporate entities.  I am a case agent responsible for the criminal investigation into Carlos Manuel da Silva Santos, Ethos Asset Management, Inc. (Ethos), and others related to the offenses he pleaded guilty to on January 30, 2025, namely conspiracy to commit wire fraud and aggravated identity theft.

2.    As outlined in Carlos Santos's plea agreement, Carlos Santos was the founder and chief executive of Ethos, a company that offered loans to borrowers requiring capital to fund business projects. To receive a loan, Carlos Santos required a borrower to provide collateral with Ethos in various ways.  The collateral was in the form of money, often in an amount that equaled a certain percentage of the total loan amount.

3.    As further outlined in Carlos Santos's plea agreement, Carlos Santos and others executed a scheme that involved making materially false, fraudulent, misleading and

deceptive representations to victims to induce them to (a) enter into a contractual agreement with Ethos to finance business projects; (b) pay Ethos the collateral; (c) delay or refrain from terminating their relationship with Ethos when requested funding did not materialize; and (d) refrain from requesting the release of their collateral. These false, fraudulent, misleading, and deceptive representations included Ethos marketing materials that contained false narratives about Ethos's history and funding of projects around the world, the dissemination of altered financial statements like bank account records and company financial statements that inflated the amount of money available to Ethos, and a publicly available website that contained false representations about Ethos's source of funds.

4.      I was involved in the calculation of the aggregate $17,125,000 loss in the plea agreement for three U.S. based victims: (a) Sector Resources, Ltd or Sector Capital Corporation; (b) Delphi Studios One LLC; and (c) Terra Financing LLC.  To calculate the $17,125,000 loss in the plea agreement, I took the total collateral money provided by the victim to Ethos and subtracted the amount of money Ethos provided to the victim as either a loan disbursement or return of some collateral money, if any.  This calculation method resulted in finding the "actual loss" to the three U.S. based victims in the plea agreement.

5.      As part of this criminal investigation, I have interviewed dozens of victims or their attorneys to understand the nature of each victim's interactions, dealings, and communications with Carlos Santos, Ethos, and others.  I have drafted contemporaneous reports of those interviews that the United States has disclosed to Carlos Santos.  I have received and reviewed documents like victim impact statements, emails, financial statements, and contracts produced to the United States by those victims.  The United States has produced those documents to Carlos Santos. I have reviewed and analyzed Ethos and third-party authenticated banking records from financial institutions in the United States and abroad from 2019 through at least November 2023.  These banking records can show receipt of credits from victims into accounts controlled by Ethos and Carlos Santos, and debits from accounts controlled by Ethos and Carlos Santos to victims, if such transactions existed at all.  Because this declaration is submitted for the limited purpose of establishing

Ethos borrowers as victims and their loss amounts, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## II.     Summary of Findings

6.     I have identified 25 victims of the criminal scheme to which Carlos Santos pleaded guilty who have lost an actual amount of in amount of $101,955,530.07.   I calculated actual loss as the amount of money a victim transferred to Ethos less any money received from Ethos. For each victim, a wire transaction occurred in the United States connected to its transaction with Ethos.

## III.     Actual Loss to Each Victim Not Referenced in the Plea Agreement

7.     The actual loss to <u>ST Property Investments Limited</u> ("ST Property") of $8,075,710.

   a. ST Property is a real estate development and property management company in Malta. Ex. 7 Stivala Decl. ¶ 2.

   b. On or about November 4, 2024, I interviewed ST Property representatives, including Michael Stivala. Attached is a written report of that interview. Ex. 7A.

   c. On or about March 21, 2022, Carlos Santos emailed ST Property various documents, including false annual financial statements that inflated Ethos's total assets, income, and profit, and falsely indicated that the statements had been independently audited by an accounting firm.  Ex. 7B.  One of those documents purported to be an "Annual Financial Statement" for Ethos ending on "28 February 2021" falsely stating that Ethos has $300,649,646 in total assets, income of $441,787,203, and that the balance sheet was "audited by an independent auditing firm Hoffman & Associates, who have been given unrestricted access to all financial records and related data." Ex. 7C.

   d. In reliance on these false financial statements and other false statements, on or about February 4, 2023, ST Property and Ethos entered into a project finance agreement where Ethos agreed to provide a €50 million loan across

various tranches in exchange for ST Property providing collateral to an Ethos bank account. *See* Stivala Decl. ¶¶ 6-10.  Carlos Santos signed the agreement on behalf of Ethos.

e.  According to authenticated bank records and records obtained from ST Property that I have reviewed, on or about February 20, 2023, ST Property wired collateral of $6,916,858 into an Ethos bank account located in the United States at Signature Bank.  *See also id.* ¶ 8.

f.  Ethos failed to disburse any money to ST Property.  *See also id.* ¶ 10.

g.  To recover its losses against Ethos, ST Property has lost an additional $424,084 in professional fees, and $734,768 in bank fees, interest, and currency exchange losses.  ST Property's total actual loss is $8,075,710.  *See* Stivala Decl. ¶ 20.

8.  The actual loss to <u>Green Glycols B.V.</u> ("Green Glycols") is $1,274,993.68.

a.  Green Glycol is a Dutch company focused on chemical production  facilities that produce glycogen and other organic chemicals.

b.  On or about December 5, 2023, I interviewed a Green Glycols representative who subsequently produced documents to me.  Attached is a written report of that interview. Ex. 8.

c.  Green Glycols submitted a victim impact statement.

d.  Green Glycol received a false annual financial statement that inflated Ethos's total assets, income, and profit, and falsely indicated that the statements had been independently audited by an accounting firm.  *See* Ex. 8A. Green Glycols also received a false account statement from Oanda Corporation, a registered Futures Commission Merchant and Retail Foreign Exchange Dealer.  The account statement purported to show Ethos with a $350,000,000 account balance, but the statement included an account number that did not exist at Oanda and therefore never had any balance.  *See* Ex. 8B.

e. Green Glycols has stated it relied on these false financial documents, and on or about November 23, 2022, Green Glycols and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $51,725,000 loan across various tranches to Green Glycols in exchange for Green Glycols issuing a $10,345,000 standby letter of credit as collateral. Carlos Santos signed the agreement on behalf of Ethos.

f. On or about January 5, 2023, a bank issued the $10,345,000 standby letter of credit on behalf of Green Glycols to Ethos in favor of East West Bank, a financial institution located in Pasadena, California.

g. Ethos never disbursed the loan funds to Green Glycols.

h. On or about July 6, 2023, Green Glycols and Ethos entered into a settlement agreement in which Ethos agreed to cause East West Bank to release the standby letter of credit.   Ethos caused East West Bank to release approximately $6 million of the standby letter of credit back to Green Glycols.

i. East West Bank claimed $1,274,993.68 against the standby letter of credit. East West Bank claimed this money because Carlos Santos had used the Green Glycols standby letter credit as collateral to obtain an advance on a credit facility issued by East West Bank to Ethos.

j. The standby letter of credit expired on or about January 6, 2024, and the remainder of its funds returned to Green Glycols.

9.    The actual loss to MgO Technologies LTD, an affiliate of MgO Systems USA LLC, (MgO) is $6,500,000.00.

a. MgO, a Canadian company, manufactures fire retardant wall panels.

b. On or about November 27, 2023, I interviewed an MgO representative who subsequently sent me documents he received from Ethos. Attached is a written report about that interview.  Ex. 9.

c. MgO submitted a victim impact statement.

5

d. MgO received false 2021 and 2022 financial statements for Ethos that inflated Ethos' total assets, income, and profit, and falsely indicated that the statements had been independently audited by an accounting firm. A copy of the 2021 and 2022 financial statements are attached. Ex. 9A and 9B.

e. MgO entered into a project finance agreement with Ethos dated July 10, 2023, with an amendment dated on or about October 23, 2023. As part of the agreement, Ethos promised to disburse a $50 million loan across various tranches in exchange for MgO depositing collateral with Ethos.

f. According to authenticated bank records that I have reviewed, on or about August 3, 2023, MgO Systems USA, LLC wired $6,500,000 into an Ethos U.S.-based bank account at Signature/Flagstar Bank. This $6,500,000 was MgO's collateral deposit to Ethos.

g. Ethos never disbursed money to MgO. Instead, on or about November 10, 2023, MgO and Ethos signed a Settlement Agreement in which Ethos agreed to return the $6,500,000 it had received from MgO. *See* Ex. 9C. Carlos Santos signed the Settlement Agreement. Ethos still has not returned this money.

10. The actual loss to <u>Gold Crew Financial LLC</u> (Gold Crew) is $1,157,333.65.

a. Gold Crew has its principal place of business in Kansas City, Kansas.

b. On or about November 17, 2023, I interviewed a Gold Crew representative who subsequently sent me documents he received from Ethos. Attached is a written report of that interview. Ex. 10

c. On or about July 10, 2023, Gold Crew and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $10 million loan across various tranches in exchange for Gold Crew depositing collateral in favor of Ethos. *See* Ex. 10A. According to the agreement, Ethos would disburse $833,333.33 every 30 days following receipt of the collateral deposit up to $10 million.

d. Prior to entering into this agreement, Gold Crew received from Ethos false bank statements purporting to show Ethos's true account balances at Citibank.

6

*See* Ex. 10B. Carlos Santos has emailed materially identical false bank statements to at least one bank, and I found similarly false bank statements on Carlos Santos's Microsoft OneDrive account. I have reviewed authenticated business records from Citibank for the Ethos account statements sent to Gold Crew, and the relevant records are attached showing the true account balances. Ex. 10C. The true balances are approximately $100 million less than what Gold Crew received.

e. According to authenticated business records obtained from Signature Bank, on or about July 21, 2023, Gold Crew wired $1,950,000 into Ethos's U.S. based bank account at Signature Bank. The $1,950,000 was Gold Crew's collateral deposit to receive loan disbursements from Ethos. Ethos did not disburse money on time.

f. According to authenticated business records obtained from Signature Bank, on or about October 10, 2023, Ethos wired $792,666.35 from its U.S. based bank account at Signature Bank to Gold Crew's bank account at Bank of America in New York.

g. Ethos did not disburse any additional funds to Gold Crew.

11. The actual loss to <u>Ferrari Agroindustria S.A.</u> (Ferrari) is $4,865,344.76.

a. Ferrari is a family-owned agribusiness company focused on the production of sugarcane and ethanol, with mills in Sao Paolo, Brazil.

b. Ferrari submitted a victim impact statement through its attorneys.

c. According to emails provided by Ferrari, on or about September 8, 2021, an Ethos officer emailed Ferrari a document titled "Annual Financial Statements for the year ended 28 February 2020" that falsely inflated Ethos's total assets and income. *See* Ex. 11, 11A, and 11B. Carlos Santos was on the email.

d. According to Ferrari's Victim Impact Statement, it relied on these misrepresentations, and on or about December 10, 2021, Ferrari and Ethos entered into a project financing agreement in which Ethos agreed to disburse

a $100 million loan across various tranches in exchange for Ferrari agreeing to deposit collateral with Ethos. Carlos Santos signed the agreement on behalf of Ethos.

e. According to business records from the bank BTG Pactual US Capital LLC obtained pursuant to a grand jury subpoena, on or about January 7, 2022, Ferrari wired $14,444,000 to a U.S bank account in the name of Ethos at BTG Pactual US Capital LLC. This money was Ferrari's collateral deposit. Carlos Santos used Ferrari's collateral to obtain a $12,400,000 line of credit from BTG Pactual US Capital LLC, and on or about January 27, 2022, Carlos Santos wired $12,000,000 of that loan to Ethos's account at Citibank and eventually to accounts in Turkey.

f. According to Ferrari's victim impact statement and corroborated by my review of Ethos's U.S.-based bank records, Ethos did not disburse money to Ferrari according to the terms of the project financing agreement. Instead, Ferrari's victim impact statement indicates Ethos caused intermittent disbursements totaling $9,722,877.14 between January 9, 2023 and August 15, 2023.

g. Ferrari reports incurring costs related to its cooperation with the government's criminal investigation of $46,012.77 for a document vendor and $98,208.99 in legal fees.

12. The actual loss to <u>Link Conexion Aerea, SA de CV</u> (TAR Airlines) is $3,900,000.

a. TAR Airlines is an airline headquartered in Mexico. According to its Victim Impact Statement, TAR Airlines operates out of 14 airports in Mexico and flies 26 routes.

b. TAR Airlines submitted a victim impact statement through its attorney. According to that statement, TAR Airlines received financial statements from Ethos for the periods ending December 2021 and 2022. *See* Exs. 12 and 12A.

These statements name Hoffman & Associates as Ethos's independent auditing firm and are signed by Defendant.

c. I have interviewed Ethos's accountant at Hoffman & Associates, and Hoffman & Associates has never provided audit services to Defendant or Ethos, and stopped bookkeeping and tax preparation services in 2020. The year 2020 balance sheet for Ethos created by Hoffman & Associates shows total assets of $116,245.19.

d. According to its victim impact statement, TAR Airlines also received four bank statements for an Ethos account at Citibank between June and October 2022. *See* Ex. 12B. These statements report monthly balances of $104,334,879, $105,894,802.05, $103,856,762.48, and $103,102,600.58. I have reviewed authenticated business records from Citibank and the monthly statements TAR Airlines received are fake. The actual monthly balances were approximately $1,334,879.05, $2,894,802.05, $856,762.48, and $102,600.58.

e. According to its victim impact statement, TAR Airlines believed the financial statements and bank statements were real and relied on these documents to pursue financing with Defendant.

f. On or about June 12, 2023, TAR Airlines and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $51,300,000 loan across various tranches in exchange for TAR Airlines depositing collateral with Ethos. Carlos Santos signed the agreement on behalf of Ethos.

g. According to authenticated business records from Signature Bank that I have reviewed and the TAR Airlines victim impact statement, on June 28, 2023, Ethos received a $3,900,000 wire into its U.S.-based bank account at Signature Bank from TAR Airlines. This was the collateral deposit for TAR Airlines.

h. Ethos has not disbursed any money to TAR Airlines.

13.    The actual loss to <u>Thai-Sing Potash Trading Pte. Ltd</u> (TSPT) is $6,500,000.

9

a. TSPT was incorporated in Singapore in 2023 to facilitate a potash mine development in Thailand and to take delivery of potash for trading purposes.

b. On or about April 3, 2024, I interviewed TSPT representatives who subsequently produced documents to me. Attached is a written report of that interview. Ex. 13.

c. In 2021, TSPT principals entered into a project financing agreement between Ethos and their other company, Thai Mozambique Logistica S.A. (Thai Mozambique), where Ethos agreed to disburse a $25 million loan in exchange for Thai Mozambique providing a $5 million standby letter of credit. On or about November 10, 2021, Thai Mozambique had a $5 million standby letter of credit issued by its bank in favor of the bank Turkiye Isbankasi A.S. as security for a credit facility for Ethos's Turkey-based entity. Ethos disbursed approximately $10 million to Thai Mozambique.

d. Prior to entering into the Thai Mozambique deal, Carlos Santos sent fake financial documents to the TSPT principals who at the time were operating Thai Mozambique. *See* Exs. 13A and 13B. These fraudulent documents include a fake 2019 and 2018 Ethos balance sheet that inflates Ethos's assets and income, a Wells Fargo bank statement that falsely states Ethos had a balance of $544,040,999.83 on April 30, 2020, and a brokerage account at Oanda with a fake balance of $100,314,720.97. Ex. 13B. I have reviewed authenticated business records from Wells Fargo and the actual balance in Ethos's account on April 30, 2020, was $160,852.05.

e. On or about August 23, 2023, TSPT and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $50 million loan across various tranches in exchange for TSPT depositing collateral with Ethos.

f. According to authenticated bank records that I have reviewed, on or about August 29, 2023, TSPT wired $6,500,000 into an Ethos U.S.-based bank

*23-CR-2507-RSH*

account at East West Bank. The $6,500,000 was TSPT's collateral deposit to Ethos.

g. Ethos never disbursed money to TSPT.

14.    The actual loss to <u>CEMAG Construcoes Engenharia LTDA</u> (CEMAG) is $1,636,800.

a. CEMAG is a company with a principal place of business in Sao Paolo, Brazil.

b. On or about May 28, 2025, I interviewed CEMAG representatives. Attached is a written report of that interview. Ex. 14. During the interview a CEMAG representative stated he recalled Carlos Santos showing him a document indicating he had over $1 billion and that Carlos Santos made statements that he had over $1 billion in assets.

c. According to documents produced to me by CEMAG, it received a document from Ethos titled "Annual Financial Statements for the year ended 31 December 2022" that falsely Ethos's balance sheet and income statement. Ex. 14A. The document also falsely stated that it had been independently audited by an accounting firm in the San Diego, California.

d. On or about July 27, 2023, CEMAG and Ethos entered in a project finance agreement in which Ethos agreed to disburse $10 million across various tranches in exchange for CEMAG depositing collateral with Ethos. Carlos Santos signed on behalf of Ethos.

e. According to email correspondence and records obtained pursuant to a grand jury subpoena, CEMAG sent $1,650,000 to escrow company Saint Joseph Trust Company LLC (Saint Joseph) to hold as escrow for CEMAG's collateral deposit to Ethos.

f. According to Saint Joseph's business records and authenticated business records from Flagstar Bank that I have reviewed, after subtracting fees Saint Joseph wired CEMAG's collateral deposit of $1,636,800 to Ethos's U.S. bank account at Flagstar Bank on or about October 4, 2023.

g.  Ethos has not disbursed any money to CEMAG based on the evidence I've reviewed.

15.    The actual loss to <u>Solatio Holding Gestao De Projetos De Energia</u> (Solatio) is $21,831,939.97.

a.  Solatio is a Brazilian company located in Minas Gerais, Brazil that works in the renewable energy sector.

b.  Solatio submitted a victim impact statement.

c.  On or about December 9, 2024, I interviewed Solatio representatives, including Pedro Vaquer Brunet.  Attached is a written report of that interview. Ex. 15. Mr. Brunet stated that Carlos Santos had told him that Mr. Santos was worth $40 billion. Mr. Brunet also stated he received an unaudited financial document which indicated Ethos's financial condition.

d.  On or about February 14, 2023, Solatio and Ethos entered into a project financing agreement in which Ethos agreed to disburse a $135,184,298.70 loan across five equal tranches in exchange for Solatio depositing collateral with Ethos. Carlos Santos and Pedro Vaquer Brunet signed the agreement.

e.   According to my interview with Pedro Brunet and corroborated with documents obtained from Saint Joseph pursuant to a grand jury subpoena, Solatio, on or about March 9, 2023, Solatio sent $29,740,545.72 to Saint Joseph to invest in a securities account. Pursuant to the project financing agreement between Solatio and Ethos, Saint Joseph obtained a margin loan on Solatio's securities account.

f.  According to authenticated business records from East West Bank and documents received from Solatio that I have reviewed, on or about March 15, 2023, Saint Joseph wired $21,831,939.97 to Ethos's U.S. bank account at East West Bank. This was Solatio's collateral deposit with Ethos.

g.  According to Mr. Brunet and corroborated by Ethos's bank records that I have reviewed,  Ethos has not disbursed funds to Solatio.

12

16.    The total loss to <u>ADM Engenharia Ltda</u> (ADM) is $733,000.

   a.  ADM is a Brazilian construction company.

   b.  ADM submitted a victim impact statement.

   c.  On or about December 9, 2024, I interviewed ADM President Ademar Malacarne. Mr. Malacarne reported receiving Ethos marketing materials that showed very large numbers from around the world. Attached is a written report of that interview. Ex. 16.

   d.  On or about September 8, 2022, ADM, Ethos, and Ethos Capital Brazil Ltda, entered into a project finance agreement in which Ethos agreed to disburse a $11,400,000 loan in exchange for ADM depositing collateral with Ethos. Carlos Santos signed the agreement.

   e.  Records obtained from Saint Joseph with a grand jury subpoena indicate ADM sent its collateral deposit to Saint Joseph.

   f.  According to authenticated business records that I have reviewed, on October 27, 2022, Saint Joseph transferred $1,683,000 into Ethos's U.S. bank account at Citibank on behalf of ADM. This was ADM's collateral deposit.

   g.  ADM reported receiving only $950,000 from Ethos in January 2023 as a loan disbursement.

   h.  Mr. Malacarne reported during the interview that Carlos Santos provided several excuses about the lack of funding, and after five months of no funding ADM retained counsel.

17.    The total loss to <u>Exsan de Mexico S.A. de C.V.</u> ("Exsan") is $3,250,000.

   a.  Exsan is a company with a principal place of business in Mexico.

   b.  On or about February 28, 2024, I interviewed an Exsan representative and Exsan subsequently produced documents related to its interactions with Ethos. Attached is a written report of that interview. Ex. 17. I have reviewed documents received from Exsan, and it received an Ethos presentation stating that Ethos's "Global Financing Operations" include $28.447 billion of

13

projects around the world, including $4.19 billion of financing in the United States. *See* Ex. 17A at 20. During the investigation, I found no evidence that Ethos had funds sufficient to finance this amount of money for projects or did finance this amount of money. I also discovered versions of this presentation sent to other victims and stored on Carlos Santos's Microsoft OneDrive cloud account.

c. On or about July 27, 2023, Exsan and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $20,000,000 loan across various tranches equaling $1,666,666.66 in exchange for Exsan depositing collateral with Ethos. The first tranche was due 30 days after Exsan sent Ethos the collateral, but an amendment to the agreement made the first tranche due November 15, 2023. Carlos Santos signed the agreements on behalf of Ethos.

d. According to Exsan's representatives, Exsan deposited $5,000,000 into a brokerage account, obtained a margin loan, and sent the $3,250,000 margin to Ethos. According to authenticated business records from Flagstar Bank that I have reviewed, on or about September 29, 2023, Ethos received a $3,250,000 deposit from Exsan into its U.S.-based bank account at Flagstar Bank.

e. Exsan reports receiving no disbursements from Ethos and the evidence collected in this case supports that fact.

18.    The total loss to <u>Gavea Comercio de Materiais de Construcao e Agropecuaria Ltda</u> (Gavea) is $864,851.92.

a. Gavea is a Brazilian company operating in the chicken and pork sector.

b. On December 9, 2024, I interviewed Gavea representatives, including Anelio Thomazzoni. Attached is a written report of that interview. Ex. 18. During that interview, Mr. Thomazzoni stated he saw a bank statement indicating Ethos had a balance of approximately $500 million. During this investigation, the government has not located an Ethos bank account with an actual balance near $500 million. Mr. Thomazzoni also stated Carlos Santos said he

14

developed an algorithm, which I understood to reference the proprietary algorithm Ethos claimed to possess and use. The investigation uncovered no evidence that Carlos Santos created an algorithm or that Ethos used one.

c. On or about June 22, 2022, Gavea, Ethos, and Ethos Capital Brazil Ltda entered into a project finance agreement in which Ethos agreed to disburse a $10,396,277.49 loan to Gavea across various tranches in exchange for Gavea depositing collateral with Ethos.

d. Documents obtained from Gavea and Saint Joseph, and authenticated business records from Citibank that I have reviewed show that on November 7, 2022, Saint Joseph transferred $1,657,928 into Ethos's U.S. bank account at Citibank on behalf of Gavea. This was Gavea's collateral deposit with Ethos.

e. Gavea reports in its victim impact statement that it received one disbursement from Ethos in the amount of $910,370.44.

19.    The total loss to <u>Cooperativa Mista Sao Luiz Ltda</u> (Coopermil) is $2,679,950.

a. Coopermil is a Brazilian cooperative associated with approximately 1,200 people who are soy, corn, and milk farmers.

b. Coopermill submitted a victim impact statement.

c. On December 9, 2024, I interviewed Coopermil representatives, including Coopermil's President and Director.  Attached is a written report of that interview. Ex. 19. They reported meeting Carlos Santos at a Chamber of Commerce conference in Brazil and met with Carlos Santos the next day. They also stated that Carlos Santos provided many excuses for not disbursing funds on time to Coopermil.

d. On or about May 15, 2022, Coopermil, Ethos, and Ethos Commercial Consultancy JSC entered into a project finance agreement in which Ethos agreed to disburse a $26,000,000 loan in exchange for Coopermil depositing collateral with Ethos.

*23-CR-2507-RSH*

e. Documents obtained from Coopermil and Saint Joseph, and authenticated business records from a financial institution indicate that on December 23, 2022, Saint Joseph transferred $4,697,550 into Ethos's U.S. bank account at Flagstar Bank on behalf of Coopermil.

f. Coopermil reports receiving a $2,017,600 disbursement from Ethos, but nothing else.

20. The total loss to <u>Cooperativa de Produtores de Sementes</u> (Coprossel) is $824,074.52.

    a. Coprossel is a Brazilian company that represents approximately 2,000 producers and rural farmers.

    b. Coprossel submitted a victim impact statement.

    c. On December 9, 2024, I interviewed Coprossel representatives including Paulo Pinto. Attached is a written report of that interview. Ex. 20. During that interview, Mr. Pinto revealed that Carlos Santos sent him balance reports indicating Ethos's financial position.

    d. On or about December 22, 2022, Coprossel and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $32,264,334.00 loan across various tranches in exchange for Coprossel depositing collateral with Ethos. Carlos Santos signed the agreement for Ethos.

    e. Documents obtained from Coprossel and Saint Joseph, and authenticated business records from a financial institution indicate that on January 20, 2023, Saint Joseph transferred $1,682,247.60 into Ethos's U.S. bank account at Flagstar Bank on behalf of Coprossel. This was Coprossel's collateral deposit with Ethos.

    f. Coprossel reports in its victim impact statement to receiving a single disbursement of $858,000 from Ethos.

21. The total loss to <u>RA Solar SPE LTDA</u> (RA Solar) is $866,614.67.

    a. RA Solar is a company with its principal place of business in Brazil.

16

b. RA Solar submitted a victim impact statement.

c. On or about December 9, 2024. I interviewed RA Solar representatives. Attached is a written report of that interview. Ex. 21.

d. On or about September 29, 2022, RA Solar, Ethos, and Ethos Capital Brazil Ltda entered into a project finance agreement in which Ethos agreed to disburse a $9,100,000 loan across various tranches in exchange for RA Solar depositing collateral with Ethos. Carlos Santos signed the agreement on behalf of Ethos.

e. According to RA Solar's victim impact statement and corroborated by authenticated business records that I have reviewed, on September 30, 2022, RA Solar sent $1,592,500 into Ethos's U.S. based bank account at Citibank. This was RA Solar's collateral deposit with Ethos.

f. According to RA Solar's victim impact statement, RA Solar received one disbursement from Ethos in the amount of $705,885.33.

g. During the December 9, 2024 interview with RA Solar, its representatives communicated that when Ethos's loan disbursements did not arrive, Carlos Santos provided several excuses including that inflation in Turkey was high and interest rates were too low.

22.    The actual loss to The Plastic Bank Recycling Corporation (Plastic Bank) is $1,725,809.00.

a. Plastic Bank is a Canadian company that helps low-income communities around the world convert plastic waste into cash and other benefits such as food vouchers.

b. Plastic Bank submitted a victim impact statement.

c. On or about November 27, 2023, I interviewed Plastic Bank representative David Katz. Attached is a contemporaneously written report of that interview. Ex. 22.

23-CR-2507-RSH

d. On or about March 31, 2023, Plastic Bank and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $14 million loan across various tranches in exchange for Plastic Bank depositing collateral with Ethos.

e. To facilitate the collateral deposit, email correspondence and records obtained from a grand jury subpoena reflect that on or about May 3, 2023, Plastic Bank sent approximately $3,500,000 to Saint Joseph for deposit into a brokerage account. Email correspondence and records from Saint Joseph reflect that Saint Joseph obtained a margin from the brokerage account, and after subtracting fees, wired the remainder to Ethos at its U.S. based bank, East West Bank, at the direction of Carlos Santos.

f. According to authenticated bank records from East West Bank that I have reviewed, on or about May 10, 2023, Ethos received $2,581,143.68 from Saint Joseph's into its U.S. based account at East West Bank. This money was Plastic Bank's collateral deposit to Ethos.

g. According to authenticated bank records from East West Bank that I have reviewed, on or about July 21, 2023, Ethos wired $1,108,333.33 from its U.S. based account at East West Bank to Plastic Bank. Plastic Bank did not receive any more disbursements from Ethos.

h. According to Plastic Bank's victim impact statement, it liquidated what was left in the brokerage account, had to lay off employees because Ethos's funding did not materialize causing it to pay $226,901 in severance payments, and suffered an actual loss of $1,725,809.

23. The total loss to <u>BRV Lotus International Limited</u> (BRV) is $7,300,000.

a. BRV is company having its principal place of business in Grand Cayman, a British territory in the Caribbean Sea.

b. BRV submitted a victim impact statement.

c. On or about March 11, 2024, I interviewed a BRV representative. Attached is a written report of that interview. Ex. 23.

18

*23-CR-2507-RSH*

d.  On or about January 23, 2023, BRV and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $50,000,000 loan across various tranches in exchange for BRV depositing collateral with Ethos. Carlos Santos signed the agreement on behalf of Ethos.

e.  According to BRV's victim impact statement and authenticated business records that I have reviewed, on January 31, 2023, BRV sent $7,300,000 into Ethos's U.S.-based bank account at Signature Bank/Flagstar Bank. This was BRV's collateral deposit with Ethos.

f.  According to BRV's victim impact statement, the March 11, 2024 interview, and on my review of authenticated bank records for Ethos's bank accounts at U.S. financial institutions, Ethos did not disburse any money to BRV.

g.  During the March 11, 2024 interview, BRV's representative explained that he primarily spoke with Carlos Santos and when Ethos funding did not materialize, BRV received many excuses including that the bank would not wire money at the $10 million threshold.

24.  The actual loss to <u>F7 Sports LTD</u> (F7 Sports) is $172,857.54.

a.  F7 Sports has its principal place of business in Wales, United Kingdom. Craig Freeman is F7 Sport's director.

b.  On or about May 30, 2024, I interviewed F7 Sports representative Craig Freeman.  Attached is a written report of that interview. Ex. 24.

c.  On or about August 11, 2021, F7 Sports and Ethos entered into a project finance agreement in which Ethos agreed to disburse a £ 5 million loan across two tranches of £ 2,500,000 each within 30 days of F7 Sports sending the pledged collateral to Ethos. Carlos Santos signed the agreement on behalf of Ethos.

d.  According to authenticated business records from Citibank N.A., on or about August 19, 2021, Craig Freeman wired $950,542.60 to AssetVest Corp's Citibank bank account in the United States. According to an agreement

between F7 Sports, AssetVest, and Ethos, AssetVest would hold F7 Sport's money in a custodial account.

e. According to authenticated business records from Citibank and Wells Fargo Bank N.A., AssetVest invested the $950,542.60 in a securities portfolio, obtained a margin loan, and on or about August 24, 2021, transmitted $617,852.69 to Ethos's U.S. bank account at Citibank. This money was F7 Sports' collateral deposit with Ethos.

f. Ethos did not disburse funds as promised under the agreement.

g. According to authenticated business records from JPMorgan Chase Bank, N.A., on or about August 17, 2022, Ethos wired $200,000 to AssetVest with the message "F7 Collateral Release." On or about August 18, 2022, AssetVest wired $200,000 to F7 Sport's law firm.

h. According to authenticated business records from Citibank, between October 13, 2021, and November 29, 2022, Carlos Santos used Ethos's U.S. account at Citibank to repay Craig Freeman on behalf of F7 Sports approximately $427,119.29.

i. According to authenticated business records from East West Bank, between December 23, 2022, and July 14, 2023, Carlos Santos used Ethos' U.S. account at East West Bank to repay Craig Freeman on behalf of F7 Sports approximately $150,565.77.

j. In total, Carlos Santos caused Ethos to repay Craig Freeman/F7 Sports approximately $777,685.06 causing a total loss to F7 Sports of $172,857.54.

25. The total loss to <u>Agropecuaria Fetz Ltda</u> (Fetz) is $1,586,348.18 plus $700,000 of incurred fees and interests attributable to Ethos.

a. Fetz is a company based in Brazil and involved in farming and agriculture.

b. Fetz submitted a victim impact statement.

c. On or about March 14, 2024, I interviewed Fetz representatives. Attached is a written report of that interview. Ex. 25.

20

d. On or about September 5, 2022, Fetz, Ethos, and Ethos Capital Brazil Ltda entered into a project finance agreement in which Ethos agreed to disburse a $21,500,000 loan across various tranches equaling $1,791,666.68 in exchange for Fetz depositing collateral with Ethos. The first tranche was due to Fetz 30 days after the deposit of collateral with Ethos. Carlos Santos signed the agreement on behalf of Ethos.

e. According to Fetz's victim impact statement and corroborated by documents received from Saint Joseph pursuant to a grand jury subpoena, Fetz obtained a loan in the amount of $5,375,000 and transferred this money to Saint Joseph to be invested in a securities account. According to authenticated business records that I have reviewed, on December 23, 2022, Saint Joseph transferred $3,377,974.85 to Ethos's U.S.-based bank account at Citibank. This was Fetz's collateral deposit.

f. According to Fetz's victim impact statement, on or about May 11, 2023, Ethos disbursed $1,791,666.67 to Fetz in Brazil. Authenticated business records from East West Bank corroborate this disbursement because on or about May 9, 2023, Ethos wired $1,723,690 to a bank in Brazil. This is the only disbursement from Ethos to Fetz apparent from the evidence in this case.

g. Fetz reports an additional loss of $700,000 spent on legal fees, interest, and operational costs incurred from the Ethos deal.

26. The actual loss to Reboucas Supermercados LTDA (Reboucas) is $836,875.

a. Reboucas is a company doing business in Brazil.

b. On or about January 26, 2024, I interviewed a Reboucas representative. Attached is a written report of that interview. Ex. 26. An attorney for Reboucas subsequently produced documents related to Ethos. One of the documents Reboucas received was an Ethos document titled "World Wide Pledge Agreement Steps" that stated the "Ethos Group" had "49 Billion Euros" available in case of an Ethos default. Ex. 26A. During the

investigation I found no evidence that Ethos or the collection of entities Carlos Santos controlled had "49 Billion Euros" at its disposal.

c. On or about October 3, 2022, Ethos and Reboucas entered into a project finance agreement in which Ethos agreed to disburse a $25,000,000 loan across 12 equal tranches every 30 days in the amount of $2,082,5000 in exchange for Reboucas depositing collateral with Ethos. An amendment changed the twelve disbursements to start on May 30, 2023 in equal installments of approximately $1,717,594.48.

d. According to my interview with Reboucas representatives, documents produced by Saint Joseph pursuant to a grand jury subpoena, and authenticated business records from Citibank, Reboucas deposited $6,250,000 to Saint Joseph, and on or about November 3, 2022, Saint Joseph wired $4,516,875 on behalf of Reboucas to Ethos's U.S-based bank account at Citibank. This was Reboucas's collateral deposit to Ethos.

e. According to Reboucas, it received two payments from Ethos: $1,900,000 and $1,780,000.

27. The actual loss to Likit Kimya San Tic A.S. (Likit Kimya) is $8,534,687.93.

a. Likit Kimya is a Turkey-based business involved in the import, export, and sale of chemicals.

b. On or about December 18, 2024, I interviewed Likit Kimya representatives. Attached is a copy of the written report of that interview. Ex. 27. During the interview, Likit Kimya's representative stated she had received a fake bank statement from Ethos and that Carlos Santos told her he had a proprietary algorithm that knew exactly when to buy and sell stocks. The investigation uncovered no evidence that Carlos Santos had a proprietary algorithm.

c. On or about May 5, 2023, Likit Kimya and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $90,310,000 loan. Phase A of the agreement required Ethos to disburse $65,310,000 across five equal

22

tranches of $13,062,000 in exchange for Likit Kimya depositing collateral with Ethos. The agreement required Ethos to disburse the first tranche 30 days after receiving Likit Kimya's collateral.

d.  According to the December 18, 2024 interview, my review of documents produced by Saint Joseph in response to a grand jury subpoena, and authenticated business records from East West Bank, on or about May 22, 2023, Saint Joseph wired $8,534,687.93 into Ethos's U.S.-based account at East West Bank.  This money was Likit Kimya's collateral deposit with Ethos.

e.  According to the December 18, 2024 interview and my review of Ethos's bank records, Ethos did not disburse any funds to Likit Kimya.

f.  During the December 18, 2024 interview, the Likit Kimya representative stated she received wire receipts from Carlos Santos, but Ethos's money never arrived.

28.    The actual loss to <u>Massai Construcoes Incorporacao E Participacao</u> (Massai) is $13,500.

a.  Massai is a company based in Brazil.

b.  On or about January 6, 2024, I interviewed a Massai representative. Attached is a copy of a written report of that interview. Ex. 28.  This representative stated that in his first meeting with Ethos, Carlos Santos made several representations about investing billions of dollars around the world.

c.  On or about September 6, 2022, Massai and Ethos entered into a project finance agreement in which Ethos agreed to disburse a $4,000,000 loan across various equal tranches in exchange for Massai depositing collateral with Ethos. Carlos Santos signed this agreement.

d.  According to documents received from Ethos's public accountant and authenticated business records from Flagstar Bank, on or about December 30, 2022, Massai had $643,500 wired into Ethos's U.S.-based bank account at Flagstar Bank.

23

e. According to the January 6, 2024 interview, Massai received approximately $630,000 from Ethos.

Date:    June 11, 2025

Brian Holerud
Special Agent
Homeland Security Investigations

24