ADAM GORDON
United States Attorney
E. CHRISTOPHER BEELER
California Bar No. 330496
New York Bar No. 5422068
CARL F. BROOKER, IV
Washington D.C. Bar No. 1022908
Assistant U.S. Attorneys
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7748
Email:     christopher.beeler@usdoj.gov
           carl.brooker@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 23-CR-2507-RSH |
| Plaintiff, | **UNITED STATES OF AMERICA'S BRIEF IN SUPPORT OF RESTITUTION FOR EXSAN de MEXICO SA de CV** |
| v. | |
| CARLOS MANUEL DA SILVA SANTOS et al., | The Honorable Robert S. Huie |
| Defendants. | |

## INTRODUCTION

This Court should reconsider any legally erroneous or manifestly unjust order. In this case that means awarding restitution to Exsan de Mexico SA de CV ("Exsan"). Applying the appropriate restitution analysis, the court should award $3,250,000 to Exsan because it was "directly and proximately harmed as a result of the commission of" Defendant's wire fraud conspiracy. Specifically, various parts of Defendant's criminal scheme directly and foreseeably caused Exsan's substantial financial loss.

## ANALYSIS

Under the Mandatory Victims Restitution Act ("MVRA"), Exsan is a victim entitled to restitution if it was "directly and proximately harmed as a result of the commission of"

1  Defendant's wire fraud conspiracy. 18 U.S.C. § 3663A(a)(2). This legal standard—which
2  is different than the applicable standard if the United States was required to prove a
3  substantive count of wire fraud related to Defendant's conduct vis-à-vis Exsan—warrants
4  restitution, which is readily supported by the record before this Court. Exsan received and
5  relied on an Ethos business proposal that inflated Ethos's success around the world, it
6  entered into a project finance agreement, gave Ethos $3,250,000 in expectation of a loan,
7  and received nothing in return. Each of these facts occurred in the course of Defendant's
8  conspiracy and the conduct is sufficiently related to the criminal scheme to justify
9  restitution.

10      The Government notes that the conspiracy conviction fully supports restitution for
11 all victims harmed in the course of the conspiracy conduct. This is a marked difference
12 from victims of individual substantive offenses. Certainly, if the United States had charged
13 Defendant with a substantive count of the federal wire fraud statute related to his conduct
14 with Exsan, and sought to prove the violation beyond a reasonable doubt, the United States
15 would have needed to show (among other elements) a material statement or representation
16 that could have influenced Exsan's decision to turn over its money to Defendant and his
17 company, Ethos Asset Management, Inc. ("Ethos"). Specifically, in the Ninth Circuit an
18 element of the federal wire fraud statute is that "the statements made as part of the scheme
19 were material; that is, they had a natural tendency to influence, or were capable of
20 influencing, a person to part with money or property." *See* Ninth Cir. Manual of Model
21 Crim. Jury Instr. 15.35; *Kousisis v. United States*, 605 U.S. --, 145 S. Ct. 1382, 1396 (2025)
22 ("For now, it is enough to reiterate that materiality of the falsehood is an element of — and
23 thus a limit on—the federal fraud statutes.").

24      Unlike a trial for wire fraud, however, the restitution phase of this case does not
25 involve a requirement to show or determine the materiality of false statements that induced
26 victims to give Defendant their money as the federal wire fraud statute requires. *See e.g.*,
27 *United States v. Chin*, 965 F.3d 41, 59 (1st Cir. 2020) (holding that "[t]he restitution
28 analysis focuses on the causal relationship between the <u>conduct</u> and the loss, not between

the nature of the statutory offense and the loss" (emphasis in original).); *Robers v. United States*, 572 U.S. 639, 645 (2014) (the proper focus is on the relationship between "the harm alleged" and the defendant's "conduct"). Rather, the MVRA requires application of a different, broader rule, namely whether a person was "directly and proximately harmed as a result of the commission of" the crime. 18 U.S.C. § 3663A(a)(2). Moreover, the statute states that "in the case of an offense that involves as an element a scheme, conspiracy," which is applicable in this case, a victim is also "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* Notably, the statute does not require that a victim suffer harm "by" the crime of conviction, but just that the victim suffer a pecuniary harm "in the course" of a criminal executing an illegal scheme. Indeed, courts have recognized that Congress "defin[ed] 'victim' expansively in scheme-based crimes." *United States v. Dickerson*, 370 F.3d 1330, 1338 (11th Cir. 2004).

The Ninth Circuit has interpreted Section 3663A to count as victims those who are "harmed by conduct beyond the count of conviction" so long as the conduct is "sufficiently related . . . [to the] overall scheme to defraud." *United States v. Johnson*, 875 F.3d 422, 426 (9th Cir. 2017). Nothing more is required. Indeed, interpreting the relevant language, the Ninth Circuit has held that "if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy. *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996). The *Reed* Court's analysis is noteworthy. Interpreting the MVRA's predecessor law—the Victim Witness Protection Act ("VWPA")—the Ninth Circuit held that a VWPA restitution order is only appropriate "for conduct" that is "an element of the offense of conviction," but for "one exception." *Id.* at 1420. That "one exception" is relevant because the exception ended up swallowing the rule. Congress included *Reed's* exceptive language in a subsequent amendment to the VWPA and in the MVRA itself. Specifically, in a post-*Reed* and post-MVRA landscape, the Ninth Circuit recognizes that "a restitution order may cover conduct that is not an element of the offense provided that 1) a scheme, conspiracy or pattern of criminal activity

3

is an element of the offense and 2) the conduct in question was part of that scheme, conspiracy or pattern of criminal activity." *Id.* at n.1.

Applying the MVRA, the Ninth Circuit has adopted an expansive application of how far the MVRA reaches. Restitution may reach relevant conduct. *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999) (holding that "when the crime of conviction includes a scheme . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted."). Restitution orders may also reach conduct that occurred beyond the statute of limitations. *United States v. Anieze-Smith*, 923 F.3d 565, 573 (9th Cir. 2019).

Considering the Ninth Circuit's broad application of the MVRA, no part of the MVRA restitution scheme conditions payment of restitution on proof that a victim was duped by a fraudulent material statement or other evidence that would have formed a sufficient basis to prove a standalone wire fraud charge. Stated differently and read as a whole, the MVRA does not require a showing sufficient to sustain a conviction of wire fraud related to a victim, but merely that the person was directly and proximately harmed "as a result" of the crime or "in the course of" a defendant's criminal conduct. "This approach to the 'victim' analysis tracks the language of the statute, as it focuses on whether the victim was 'harmed as a result of the <u>commission</u> of an offense' or 'by the defendant's criminal <u>conduct</u> in the course of [a] scheme, conspiracy . . ." *Chin*, 965 F.3d at 59-60 (emphasis in original). Here, that's significant. All the evidence demonstrates that Exsan was harmed "as a result of the commission of" Defendant's criminal scheme. Afterall, had Ethos been an entirely legitimate concern, Ethos could have and likely would have repaid Exsan following Defendant's arrest during normal business operations. The fact Ethos has not paid Exsan is proof that Exsan was directly harmed by the crime.

This qualitative difference between the legal regime governing sufficient proof to prove wire fraud at trial and the requisite proof to establish "victimhood" at the restitution phase following a conviction for wire fraud conspiracy is important. It also compels a finding that Exsan is a victim who Defendant directly and foreseeably harmed during "the

4

course of the scheme," 18 U.S.C. § 3553A(a)(2), he perpetrated using "conduct that was part of the conspiracy." *Reed*, 80 F.3d at 1423.

The First Circuit's reasoning in *Chin* is instructive. There, a jury convicted defendant of a racketeering conspiracy related to him contaminating pharmaceutical drugs his employer sold to hospitals that subsequently harmed patients. *Chin*, 965 F.3d at 45-46. At sentencing, the district court awarded restitution under the MVRA to "the hospitals and clinics that purchased the lots of degraded drugs," *id.* at 46, but found that "end-users and patients" of the contaminated drugs were not victims, *id.* at 59. The district court reasoned that the hospitals and clinics were the only victims because the "misrepresentations" were made to them, but not to the patients who used the harmful drug combinations. *Id.* The appellate court reversed, holding that "patients and insurers" could be victims "within the scope of the MVRA." *Id.* The *Chin* Court's analysis shows that the MVRA applies broadly—beyond those victims who simply relied on false representations—and can reach any victim whose harm has a sufficient casual relationship to a defendant's criminal *conduct*.

Applying the appropriate restitution rule, Exsan is a victim. *First*, Exsan was directly harmed during Defendant's execution of the criminal scheme and by conduct that Defendant admitted was part of the scheme. It's uncontested that in July 2023, Exsan and Ethos entered into a project finance agreement in which Ethos agreed to loan Exsan money in exchange for Exsan sending an upfront collateral deposit to Ethos. *See* ECF 156-3, Holerud Decl. ¶ 17(c); *see also* ECF 174-4. On or about September 29, 2023, Exsan wired that deposit to Ethos in the amount of $3,250,000. Holerud Decl. ¶ 17(d). Ethos did not disburse any money to Exsan. *Id.* ¶ 17(e). These facts alone justify restitution because the facts closely mirror the conduct of the criminal scheme described in Defendant's plea agreement. Indeed, the fact Defendant and Ethos failed to disburse money to Exsan is evidence that Defendant intended to defraud Exsan like other victims of his scheme. At a minimum, these undisputed facts establish conduct that is "sufficiently related . . . [to the]

overall scheme to defraud" executed by Defendant. *Johnson*, 875 F.3d at 426. Therefore, the court should order restitution to Exsan.

There is also more. The parties entered into the agreement in July 2023, but in Exsan's own telling in "January and February 2023," at least five months before entering into the agreement and sending money, Exsan received "two versions of the Ethos Business Profile Document presentation." ECF 174 at 2. Attached as Exhibit 3 to its motion for reconsideration, this "Ethos Business Profile" contained material falsehoods including that Ethos had "Global Financing Operations" of $28.447 billion for projects around the world, and $4.19 billion in the United States. *See* ECF 174-3 at 52. The uncontested record proves the falsity of this statement about Ethos's history of funding projects. *See* Holerud Decl. ¶ 17(b) (testifying about this same document, "during the investigation, I found no evidence that Ethos had funds sufficient to finance this amount of money for projects or did finance this amount of money."). This type of false statement is precisely the kind Defendant admitted was part of his criminal scheme; "the materially false, fraudulent, misleading, and deceptive representations made by SANTOS and others concerned, among other things: (a) the nature of Ethos' history of funding projects or ability to obtain financing." ECF 121, Plea Agreement at 4. Accordingly, Defendant directly harmed Exsan by "conduct that was part of the conspiracy," *Reed*, 80 F.3d at 1423, and "in the course" of Defendant's execution of his criminal scheme.

Moreover, and while irrelevant to the restitution analysis, the "Ethos Business Profile" document was a materially false statement that induced Exsan into sending Ethos money. Exsan's motion indicates it did rely on this type of false description of Ethos's size and financial scope—"Exsan relied on the repeated representations as to the financial strength of Ethos." ECF 174 at 3. In addition, the evidence shows Carlos Santos agreed that the false information contained in the "Ethos Business Profile" was material to Exsan's inducement. Specifically, in the written agreement between Exsan and Ethos, which Defendant signed and is part of the evidentiary record, *see* ECF 174-4 at 19, Defendant agreed "[a]ll information contained in documents submitted to Party B [Exsan] by Party A

6

[Ethos] is true *in all material respects*." *Id.* at 10, ¶ 5.1(iii) (emphasis added). The "Ethos Business Profile" is a "document submitted to" Exsan by Ethos, and Santos warranted that the information contained in that document was material, meaning Defendant has conceded this false document "had a natural tendency to influence, or were capable of influencing, a person to part with money or property." *See* Ninth Cir. Manual of Model Crim. Jury Instr. 15.35. Here, Defendant acknowledged the materiality of false information contained in the "Ethos Business Profile" that his coconspirators sent Exsan.

The $3,250,000 loss to Exsan was reasonably foreseeable to Defendant. Analyzing the proximate cause requirement in Section 3663A(a)(2), the Supreme Court explained that "[t]he basic question that a proximate cause requirement presents is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Robers*, 572 U.S. at 645. Here, the pecuniary harm to Exsan meets the test. Defendant and his coconspirators sent "materially false, fraudulent, misleading, and deceptive representations" to Exsan in the form of the "Ethos Business Profile. The project agreement between Ethos and Exsan acknowledged that this information was material—that is it had a natural tendency to influence Exsan. Expecting a loan under the terms of the agreement, Exsan sent Ethos $3,250,000, but Ethos did not disburse funds to Exsan, which was part of the admitted scheme. This fact pattern is not only sufficiently close to the conduct described in the plea agreement, it fits the described scheme like a glove and therefore Exsan's financial loss was a foreseeable consequence of Defendant's criminal scheme. Accordingly, Exsan fulfills the proximate cause requirement.

## CONCLUSION

For these reasons, the United States respectfully asks this Court to award Exsan restitution in the amount of $3,250,000.

Date: August 20, 2025

ADAM GORDON
United States Attorney

/s/ *E. Christopher Beeler*
E. CHRISTOPHER BEELER
CARL F. BROOKER
Assistant United States Attorneys